Anthony C. HOSKINS, Appellant,

v.

STATE of Indiana, Appellee.

No. 281S32.

Supreme Court of Indiana.

Nov. 4, 1982.

Charles A. Asher, Joseph D. Bradley, South Bend, for appellant.

Linley E. Pearson, Atty. Gen. of Ind., Palmer K. Ward, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-appellant, Anthony C. Hoskins, was convicted of two counts of Murder, Ind.Code § 35–42–1–1 (Burns Repl. 1979), at the conclusion of a jury trial in St. Joseph Circuit Court on July 22, 1980. Appellant Hoskins was sentenced to two consecutive terms of sixty (60) years imprisonment. This appeal arises from those convictions and sentences.

Appellant raises eleven issues on review, concerning:

1. the State's striking for cause jurors indicating a religious or conscientious objection to the death penalty;
2. denying permission to Appellant to cross-examine jurors before striking them for cause;
3. denying Appellant's request to have the State indicate its reasons for making peremptory challenges;
4. denying Appellant's request for a budget which would be used to obtain evidence concerning juries which favor the death penalty;
5. the admission of fingerprint evidence;
6. the admission of testimony of one witness elicited through leading questions;
7. the giving of State's instructions 1, 3, and 6;
8. the giving of the trial court's instruction 7 on reasonable doubt;

9. the refusal to give Appellant's tendered instructions 5, 8, 10, 12, and 13;

10. sufficiency of the evidence; and,

11. error in sentencing the Appellant.

On the morning of October 20, 1979, Ruth Hootman and Carolyn Mosher were found bound and gagged in a motel in South Bend, Indiana. Money had been taken from the cash drawer and both women had been shot in the head. Hootman was dead at the scene and Mosher died at a local hospital. Appellant was arrested and convicted of the murders.

## I

Several prospective jurors were challenged for cause over Appellant's objection and excused by the court because they had conscientious objections to, or reservations about, the death penalty. Appellant argues that this is in contravention of the holding of the United States Supreme Court in *Witherspoon v. Illinois,* (1968) 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. The State points out that the jurors involved here were excused after stating that they would not recommend the death penalty under any circumstances. An example involving all of the excused jurors is illustrated by an exchange between Mr. Flowers, one of the jurors struck for cause, and the trial court:

"THE COURT: ... I'm asking you whether if there is a verdict of guilty in the first stage, whether during the second stage you would be willing and able to follow conscientiously the instructions of the Court and then after you have considered the evidence and the instructions, made your findings beyond a reasonable doubt and so forth, would you be able to consider at that point whether a recommendation should be made that the death penalty be imposed?

MR. FLOWERS: That is pretty touchy.

THE COURT: I know it is, but I'm asking you whether you could do it conscientiously and under the instructions of the Court.

MR. FLOWERS: Well, that's taking a man's life in hand. I don't think I could handle that too well.

THE COURT: All right. I guess maybe there would be a lot of people that would say the same thing, that might not be able to handle it too well, but I guess what we are saying is could you handle it, could you yourself handle it. I'm not asking you whether you would do it, I'm asking you if you could conscientiously consider it under the law and under the facts and consider whether recommendation should be made.

MR. FLOWERS: I will just have to answer, "No."

THE COURT: You couldn't do that?

MR. FLOWERS: I don't think I could do it.

THE COURT: Then I guess what you are saying, or am I right in this, that your beliefs about capital punishment would lead you to ignore the law and violate your oath as a juror?

MR. FLOWERS: Well, I guess it could almost be boiled down to that, but it is not truly what I mean. That capital punishment thing is in the back of my mind and I'm afraid it would overshadow my thoughts on that.

THE COURT: All right. Are your beliefs such that you are irrevocably committed before the trial begins to vote against the death penalty regardless of what the facts and circumstances of the case are?

MR. FLOWERS: That's right."

We feel that these prospective jurors were properly excused in line with the decision of *Adams v. Texas,* (1980) 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581, where the United States Supreme Court said: "We repeat that the State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths." *Id.* at 50, 100 S.Ct. at 2529, 65 L.Ed.2d at 593. We also agree with the State's contention that Appellant has not shown that he was prejudiced by the court's excusing these jurors either under *Witherspoon* or *Adams,* since

the jury did not recommend the death penalty and it was not imposed. It was the holding in both *Witherspoon* and *Adams* that the death penalty may not be carried out where the jury that imposed or recommended it was selected by excluding prospective jurors who voiced general objections about the death penalty; neither case required that the convictions be set aside. We find no merit in Appellant's argument here.

## II

■ Appellant raises another issue which is related to Issue I. The record shows that defense counsel examined the prospective jurors on voir dire but Appellant now claims that he should have been given the right to cross-examine the jurors who had objections about the death penalty before they were excused for cause. Appellant argues that his due process rights · were violated and that the refusal of cross-examination violated his right of confrontation of witnesses or, at any rate, seems to imply that it is the same kind of right that a person has to confront witnesses testifying against him. We fail to see a confrontation question here since these jurors did not testify in any manner and certainly gave no evidence against this appellant. It appears that they were excused for reasons approved in *Adams v. Texas,* supra, and as we stated in Issue I above, we fail to see any prejudice to this appellant which would warrant reversing his convictions since the death penalty was not imposed. Appellant gives us no reasons or points to any authority allowing the cross-examination of jurors; instead, he urges that this is a violation of his due process rights. We see no error presented in this issue.

## III

■ On October 21, 1980, Appellant filed what he captioned "Amendment to Motion to Correct Errors." In the amended motion, Appellant claimed that the State improperly made use of the right to peremptorily strike black jurors without listing the reasons for doing so. We disagree with Appellant's argument. A peremptory challenge is what the name implies. There is no need for the prosecution to explain its reasons for the exercise of such a challenge. The United States Supreme Court held in *Swain v. Alabama,* (1965) 380 U.S. 202, 222, 85 S.Ct. 824, 837, 13 L.Ed.2d 759, 773:

"In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes."

This contention of Appellant cannot warrant reversal. *Williams v. State,* (1974) 160 Ind.App. 549, 312 N.E.2d 526.

## IV

■ On November 24, 1980, Appellant filed what he entitled "Second Amendment to Motion to Correct Errors" and claimed the trial court erred in refusing to provide him with a $2500 budget to be used to gather and present evidence to establish the connection between the conviction rates of juries which favor the death penalty and those juries made up of jurors where some favor the death penalty and some oppose it. Appellant is entitled to an impartial jury selected from a panel which is representative of a fair cross-section of the community. *Burr v. State,* (1980) Ind., 403 N.E.2d 343; *Oricks v. State,* (1978) 268 Ind. 680, 377 N.E.2d 1376. The appellant is not entitled to anything more than that. The trial court did not err in refusing to fund Appellant's request.

## V

■ Appellant contends that the trial court erred in permitting the introduction of physical and testimonial evidence regarding fingerprints of persons other than Appellant for which there was no adequate foundation or chain of custody. Appellant was especially concerned with a card marked "Albert Jackson." Witness Driver, a fingerprint expert for the F.B.I., testified that there were a large number of fingerprints about the area of the murders and also about the car that Appellant drove to Milwaukee after committing the murders. Driver indicated that there were ten persons he could identify from the fingerprints taken at the scene and the information furnished to him, and twenty-seven prints from which he could not identify the persons leaving the prints. The witness identified all of the prints lifted from the scene and had exemplar cards of several persons whose prints he could identify as being among them. Several of the prints were identified as those of Appellant Hoskins. Besides identifying Appellant's prints, Driver also identified prints belonging to one of the victims Ruth Ann Hootman, and two of the witnesses, Delores Watson and Elfrieda Unger, but stated that none of the prints matched an exemplar card he had for Albert Jackson. Appellant argues that this negative evidence, suggesting that Albert Jackson was not at the scene of the crime, results in reversible error.

We stated recently in *Collins v. State,* (1981) Ind., 415 N.E.2d 46, 52:

"Nonfungible items do not require the high decree (sic) of scrutiny that must be applied to fungible items. *Proctor v. State,* (1979) Ind., 397 N.E.2d 980; *Wilson v. State,* (1975) 263 Ind. 469, 333 N.E.2d 755. Evidence of fingerprints is capable of eyewitness identification. It is a sufficient foundation for the introduction of such evidence that a witness identifies it and it has relevance to the issues of the case. *Proctor v. State, supra; Woodard v. State,* (1977) 267 Ind. 19, 366 N.E.2d 1160."

Driver testified that all of the prints he received were the ones lifted at the crime area. He indicated that he sent the prints to the F.B.I. laboratory for comparison and obtained the exemplar cards he had with him on the stand. On cross-examination by the defense, Driver indicated to defense counsel that he had a large number of prints and that he identified the appellant's prints and those of other persons who were known to have been about the scene and whose names had been furnished to him. He said there were twenty-seven sets of prints that he could not identify because he had no examples or exemplars to compare them with. It was in this light that he indicated his use of the exemplar cards. Witness Driver attempted to compare the prints from the F.B.I. files of all of those persons who were known to have been at the scene of the crime. Hootman, Watson, and Unger were such persons and their prints were found in the motel. There were still twenty-seven sets of fingerprints that could not be tied to any particular persons. Apparently the name of Albert Jackson was furnished to Driver since Jackson's name had been brought into the case by one of the witnesses on cross-examination. Driver testified that he pulled Jackson's exemplar out of the F.B.I. files. Appellant's theory of the case had long been that he was present only to commit a robbery and neither intended to nor did take part in any killings; therefore, there was a suggestion that another person was present who took part in the entire transaction and actually committed the murders. Al Jackson was suggested to be this person and the fact that no prints of Jackson were found in the area tended to negate the appellant's defense. There was sufficient foundation shown to introduce the testimony concerning the prints found at the scene, plus the evidence concerning the absence of Jackson's prints; in addition, inasmuch as the witness was able to testify that the appellant's prints were found at the scene of the crime and that one of his fingerprints was found on a doctor's receipt lying in the cash drawer in the room where one of the bodies was found, we do not see how Appellant

was harmed by the introduction of this evidence. In light of Appellant's admission that he was present and took part in the crimes of robbery, together with all of the evidence against him, the negative implication that Albert Jackson was not at the scene was not reversible error.

## VI

■ Appellant contends that the trial judge should have stricken the entire testimony of Delores Watson as that testimony was elicited through extensive leading questions on direct examination. The record shows that Appellant objected several times to the manner in which the prosecuting attorney examined witness Watson because of the use of leading questions to elicit testimony. The prosecutor, on many of these occasions, admitted that he had been using leading questions but indicated it was inadvertent and promised that he would refrain from doing so. The trial court sustained the objections made when the questions were clearly leading and admonished the prosecuting attorney to frame his questions in the proper manner. It appears that the trial judge properly managed the situation and was not required to strike the entire testimony of the witness. The rule followed by this Court was stated in *Siblisk v. State,* (1975) 263 Ind. 651, 655, 336 N.E.2d 650, 652:

> "Whether a leading question is to be allowed is largely a matter of trial court discretion. Reversible error will be found only upon a showing of abuse of that discretion. *Shipman v. State,* (1962) 243 Ind. 245, 183 N.E.2d 823, *cert. denied* 371 U.S. 958, 83 S.Ct. 515, 9 L.Ed.2d 504 (1963); 30 I.L.E. *Witnesses* § 90 (1960)."

As we have indicated above, the record shows that the trial judge did not abuse his discretion in allowing the testimony of the witness Watson to stand.

## VII

There were no eyewitnesses to these crimes. Appellant's defense was based on the fact that he might have been present when the killings took place but there was an unknown second person who also participated and who actually perpetrated the homicides without Appellant's knowledge. The defense did not deny that Appellant agreed to take part in the robbery and did, in fact, take part in it but stated that he had no intention to kill anyone and did not take part in killing anyone. This defense was revealed in the opening statements of defense counsel and was followed by cross-examination of State's witnesses. In its final instructions, the trial court gave State's tendered instructions 1, 3, and 6, over objection of Appellant. These instructions were as follows:

*Number 1:*

"A defendant may be convicted as a principal upon evidence that the defendant aided in the perpetration of the crime charged. A defendant is responsible for the acts of his confederate as well as his own as provided by the statute I have just read to you." (Record, p. 291)

*Number 3:*

"You are instructed that there was in full force and effect on October 20, 1979 in the State of Indiana a criminal statute which reads as follows:

A person who knowingly or intentionally aids, induces or causes another person to commit an offense commits that offense even if the other person:

1. has not been prosecuted for the offense;

2. has not been convicted of that offense; or

3. has been acquitted of the offense." (Record, p. 293)

*Number 6:*

"You are instructed that a person engaged in the commission of an unlawful act is criminally liable for probable and natural consequences, including everything done by confederates, which follows, incidentally, in the execution of a common design, even though not intended as part of the original design." (Record, p. 296)

■ Appellant now argues that it was improper to give these instructions since the theory of the State's case was that Appel-

lant himself perpetrated these crimes and did not aid or abet anyone else in committing them. He further argues that it was improper for the State to submit these instructions after the close of all the evidence and that the submission of them at this time amounted to an amendment of the charges against this appellant because the State was, in effect, charging Appellant with a different crime than that with which he had originally been charged. The State properly points out that it was not required to tender final instructions pursuant to Ind. Code § 35–1–35–1 (Burns Repl.1979) (now repealed) until the close of all of the evidence as that section of the Code provides that special instructions desired by either party shall be delivered in writing to the trial court prior to the commencement of the argument. This refers to the final arguments of counsel following the presentation of the evidence. Furthermore, the evidence in the cause is one of the elements that determines what instructions are to be given; therefore, final instructions cannot be ultimately resolved until all parties rest on their evidence.

■ The evidence which tended to show that the appellant himself did not actually commit the murders was introduced by Appellant in an effort to show that he was present and took part in the robbery but did not take part in any killings. The instructions on confederate liability were properly given by the trial court. They do not represent an additional charge nor a new theory in the cause. The trial court properly stated that there is no separate crime of being an accessory to a crime or aiding and abetting its perpetration. One can be charged as a principal and convicted on proof that he aided or abetted another in committing the crime. Instruction No. 3 was a recitation of the statute which states this to be so. Ind.Code § 35–41–2–4 (Burns Repl.1979). The legislature provided that a person who knowingly or intentionally aids or induces or causes another to commit an offense commits that offense himself. Instruction No. 1 told the jury a person may be convicted as a principal upon evidence that he aided in the perpetration of the crime by another. Instruction No. 6 properly instructed the jury that a person engaged in the commission of an unlawful act is criminally liable for probable and natural consequences including everything done by a confederate which follows incidental to the execution of a common design even though it was not originally intended as a part of the original design. The giving of these instructions or very similar ones has been approved by this Court in *Fortson v. State,* (1979) Ind., 385 N.E.2d 429, and *Parker v. State,* (1978) 267 Ind. 660, 372 N.E.2d 1178. The instructions properly state the law and an examination of the evidence reveals that it was proper to give these instructions to the jury.

## VIII

■ In its preliminary instructions and final instructions, the trial court gave Instruction No. 7:

"A 'reasonable doubt' is a fair, actual and logical doubt that arises in your mind after an impartial consideration of all of the evidence and circumstances in the case. It should be a doubt based upon reason and common sense and not a doubt based upon imagination or speculation.

To prove the defendant's guilt of the elements of the crime charged beyond a reasonable doubt, the evidence must be such that it would convince you of the truth of it, to such a degree of certainty that you would feel safe to act upon such conviction, without hesitation, in a matter of the highest concern and importance to you." (Record, p. 170)

Appellant objected to the use of the word "arises" in the first sentence because it suggests to the jury that a reasonable doubt must be created by the evidence and does not recognize that reasonable doubt could be created from the very beginning of the case or could exist notwithstanding the evidence. Appellant suggested to the trial court the use of the words "remains" or "exists" rather than "arises." Appellant concedes that this instruction comports with reasonable doubt instructions given by

courts and approved by the appellate courts in Indiana, see *Sypniewski v. State*, (1977) 267 Ind. 224, 368 N.E.2d 1359, but suggests such approval be reconsidered. This instruction does, in fact, comport with approved reasonable doubt instructions and we approve it again in this case. The instruction told the jury that a reasonable doubt must arise in the mind of the juror after an impartial consideration of all the evidence and circumstances in the case. This is the proper manner in which a juror is to consider reasonable doubt. A doubt cannot arise from some fact or circumstance outside the evidence or something in the juror's mind that is not based upon an impartial consideration of all the evidence and circumstances.

▬▬▬ Appellant further contends that the second sentence of the instruction, in which the jurors were told a reasonable doubt cannot be based upon imagination or speculation, is error. Appellant argues that it is proper for the jurors to use their imagination or to speculate when they consider circumstantial evidence since such speculation and imagination may lead to the discovery of a reasonable hypothesis of innocence that requires the appellant to be found not guilty. We cannot accept this contention. Any consideration and determination of the jury is to be made on the evidence presented to them. Imagination or speculation is not a proper basis for presenting evidence nor for analyzing it or reaching conclusions based on it. In fact, the purpose of our rules of evidence and the procedures we follow in conducting a trial is to remove imagination and speculation from the process and to determine the best we humanly can that an individual is guilty or not guilty based on sound probative evidence. Appellant further complains that the last sentence of the instruction is an incomplete statement since it tells the jurors they should act only if they would feel safe to act upon such a conviction without hesitation in a matter of the highest concern and importance but did not tell them that they should consider this standard when there is no compulsion to act at all. Although it would have been proper to com-

plete the sentence in that manner it is not mandatory that it can be done in order to make the instruction proper. Further, the State points out that the defendant did not himself submit an instruction to the court on reasonable doubt that might have added what this instruction lacked. This constitutes waiver of any alleged error. *Swan v. State*, (1978) 268 Ind. 317, 375 N.E.2d 198. In view of all the other instructions given to the jury, the court's Instruction No. 7 sufficiently instructed the jury on reasonable doubt.

## IX

Appellant tendered his instructions 5, 8, 10, 12, and 13, which were refused by the trial court. Appellant's tendered instructions 5 and 8 told the jury that it is no crime to be present at another person's commission of a crime and unless the jurors found beyond a reasonable doubt that Appellant actually committed the alleged murders, that is, actually fired the shots that killed the two victims, they must find him not guilty. The trial court properly refused these two instructions because we have often stated that it is not error to refuse instructions that incorrectly state the law. *Norton v. State*, (1980) Ind., 408 N.E.2d 514, 537. As we pointed out in Issue VII above, a person engaged in the commission of an unlawful act is criminally liable for probable and natural consequences, including everything done by confederates, which follows incidentally in the execution of the crime. A person may be convicted as a principal upon evidence that he or she aided or abetted in the perpetration of the charged crime.

▬▬▬ Appellant's tendered instruction No. 10 would have told the jury that evidence that a criminal defendant did not permanently flee the jurisdiction to avoid trial may be considered as evidence of his innocence. Appellant claims the right to this instruction based on a use by the State of flight instructions which tells a jury that when a person flees, that fact can be used as an inference of guilt. See *Jones v. State*,

(1981) Ind., 425 N.E.2d 128, 133. Support for this instruction based on the evidence was suggested by the appellant because he remained in the jurisdiction after these crimes were committed and, in fact, talked to two police officers asking for directions to Milwaukee and then returned after one day to South Bend from Milwaukee.

Appellant argues that if the State is permitted to have flight instructions given in proper cases, then in all fairness defendants ought to have a right to have jury instructions stating that a failure to flee shows a lack of consciousness of guilt. We disagree. In the first place, there was no instruction given on flight. In the second place, we cannot accept Appellant's logic in this regard. Flight is a conscious, overt act, known and accepted to be a response to a consciousness of guilt in a person and a means of preventing apprehension and punishment. A failure to flee is not an overt act and gives substance to a negative proposition that does not necessarily follow from a failure to flee.

Appellant's tendered instruction No. 12 suggested that the jury could find the appellant guilty of a lesser included offense of battery. The trial court properly refused this instruction. As this Court stated in *Minton v. State,* (1978) 269 Ind. 39, 45, 378 N.E.2d 639, 642–43:

"To determine whether a court has committed error in refusing to instruct the jury on lesser included offenses, one must decide not only whether, by the language of the statute and the indictment or information, the lesser included offense is necessarily included within the greater, but also whether there has been evidence introduced at trial to which such an instruction would be applicable. *Harris v. State,* (1977) 266 Ind. 661, 366 N.E.2d 186; *Hester v. State,* (1974) 262 Ind. 284, 315 N.E.2d 351; *Hash v. State,* (1972) 258 Ind. 692, 284 N.E.2d 770."

Appellant in this case did not deny that there were two murders committed but instead claimed that someone else was the perpetrator of those crimes. There was no evidence to show that the crimes committed might have been battery rather than murder.

Finally, Appellant tendered instruction No. 13, which stated:

"Evidence that a suspect other than defendant fled the jurisdiction after learning that he was a suspect in this case may be considered by you as evidence of that suspect's consciousness of guilt of the crimes charged against defendant."

Appellant suggests support for this instruction because Sergeant Hostetler testified that after talking to Al "Junior" Jackson on the phone, Jackson fled the jurisdiction. However, as the trial judge noted on the margin of the tendered instruction, there was no evidence developed to show that Jackson was a suspect in this case, or that any suspect fled the jurisdiction. Instructions are to be based on the evidence. To imply to the jury that it could consider this incident in determining the guilt or innocence of the appellant here would invite the jury to speculate. There was no evidence on which to base this instruction and the court properly refused it.

## X

Appellant's theory that there was insufficient evidence to convict him of murder is based on his claim that the State had charged him as a principal and that there was no substantial evidence to prove beyond a reasonable doubt that he committed the murders. Appellant reasons that since there was evidence tending to show another person may have been the murderer, there is only circumstantial evidence to show either that Appellant did, in fact, act as a trigger man or that there was some agreement with the appellant and one or more persons who may have done the actual killing. He therefore claims that the State did not exclude every reasonable hypothesis of innocence which is the test the jury must use in determining the guilt or innocence of a defendant when faced with circumstantial evidence. Appellant cites *Spears v. State,* (1980) Ind., 401 N.E.2d 331 for support.

Appellant's arguments on this issue are based on misinterpretation and misstate-

ment of the law. The test under *Spears* is to be used by the trier of fact at trial but is not the test used by this Court in reviewing a finding of guilt. When reviewing the sufficiency of the evidence this Court will not weigh the evidence or determine the credibility of witnesses. Rather, we will consider only that evidence which is most favorable to the State, together with all logical and reasonable inferences to be drawn therefrom. The verdict will be upheld so long as there is sufficient evidence of probative value from which the jury could find the defendant guilty beyond a reasonable doubt. *Showecker v. State,* (1982) Ind., 432 N.E.2d 1340, 1342; *Willard v. State,* (1980) Ind., 400 N.E.2d 151, 160.

There was a great deal of evidence here that pointed directly to the appellant. His thumbprint was found on a receipt in the room where the victims were found and his palm print was found in the motel office adjacent to that room. These prints show presence at the scene and presence at the scene in connection with other circumstances tending to show participation in the crime may be sufficient to sustain a conviction. *Wright v. State,* (1977) 266 Ind. 327, 363 N.E.2d 1221; *McGill v. State,* (1969) 252 Ind. 293, 247 N.E.2d 514. Further, Appellant was a former tenant of that motel and told one witness, Delores Watson, on the evening of October 19, 1979, of his plan to rob a motel at which he had previously stayed, and asked her to help him obtain a scarf, mask and glasses. The following morning he displayed a large sum of money and told Watson that he had robbed the place and that two people were dead. Watson and Appellant drove to Milwaukee that day and bought $400 worth of marijuana and also sold the murder weapon to a man living in Milwaukee. Additionally, and very importantly, the defense did not deny that Appellant took part in this robbery that resulted in the murder of two women. Appellant's claim was that he did not intend for any killings to take place and did not pull the trigger that resulted in the deaths of Ruth Hootman and Carolyn Mosher. This, of course, was his defense and the jury had the duty to weigh all the evidence and reach a decision that it felt was merited. One can be convicted of murder if the evidence shows either that he committed the murder as a principal or that he aided and abetted someone else in committing the murder or, to put it another way, a confederate committed the murder in the commission of a crime, such as robbery. There was sufficient and ample evidence for the jury to reach the conclusion it did in finding Appellant guilty of these two murders.

## XI

Finally, Appellant argues that the trial court did not properly sentence him because he was given the maximum sentence of sixty-year terms for each of the murders and the sentences were to be served consecutively. Since the trial court said it did not know whether the jury convicted Appellant as the principal actor in the murders or as an accomplice, Appellant argues that the trial court was not justified in handing out the maximum sentences for murder. We disagree.

We have previously held that there is no constitutional right to have sentences run concurrently. *Phillips v. State,* (1981) Ind., 425 N.E.2d 119, 121; *Merrifield v. State,* (1980) Ind., 400 N.E.2d 146, 151. Ind.Code § 35-50-1-2 (Burns Repl.1979) provides that the trial court "... shall determine whether terms of imprisonment shall be served concurrently or consecutively." We wrote in *Bish v. State,* (1981) Ind., 421 N.E.2d 608, 620:

"Our applicable rule states that we will not adjust a sentence which is authorized by statute and which is not manifestly unreasonable in light of the nature of the offense and the character of the offender. Moreover, a sentence is not "manifestly unreasonable" if any reasonable person could find the sentence to be appropriate to the particular offense and offender. Ind.R.App.Rev.Sent. 1, 2. This Court has also held that, when the trial court increases or decreases the sentence, or orders the sentences to be served consecutively, the record should disclose the factors considered by the court to constitute

aggravating or mitigating circumstances. *Gardner v. State,* (1979) Ind., 388 N.E.2d 513, 517. Thus, if the sentences imposed were authorized by statute, if those sentences are not manifestly unreasonable, and if the record discloses the trial court's finding of aggravating and/or mitigating circumstances, this Court will not revise or strike down the sentences in question. We are not bound to conduct a *de novo* review of the sentencing hearing and assess or reweigh the trial court's findings and conclusions regarding aggravating and mitigating circumstances."

The trial court listed its reasons for enhancing the appellant's terms of imprisonment to the maximum time period. The aggravating circumstances found included: the appellant's prior criminal record; the need for correctional treatment would best be provided by incarceration; a reduced sentence would depreciate the seriousness of the crime; there was a risk that Appellant would commit similar crimes; and, the serious nature of the crimes justified such terms. All of these factors are in accord with the sentencing statutes, Ind.Code § 35–4.1–4–1 *et seq.* (Burns Repl.1979). We do not agree with Appellant's contention that the fact that he might have acted as an accomplice to murder should be construed as a great mitigating factor, thereby reducing his sentences. After reviewing the record we do not find the imposition of consecutive sentences or the sixty-year terms to be unreasonable in light of the nature of the offense and character of the offender.

The judgment of the trial court is affirmed.

GIVAN, C.J., and DeBRULER, J., concur.

PRENTICE, J., concurs in result with separate opinion in which HUNTER, J., concurs.

PRENTICE, Justice, concurring in result.

I concur in the result reached by the majority but, I disagree with its treatment of Issue I. As hereinafter related, whether or not the trial judge acted properly in excusing certain prospective jurors, including Mr. Flowers, is subject to serious question. Assuming that he did err in this regard, the defendant, nevertheless, was not thereby prejudiced. Inasmuch as *Witherspoon v. Illinois,* (1968) 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, upon which he relies, holds only that a state may not constitutionally execute a death sentence imposed by a jury culled of all who expressed opposition to capital punishment, it affords him no shelter, since the death penalty was not imposed. It is for that reason alone that I concur in the result reached by the majority upon that issue. I take vigorous exception, however, to the majority's having gone further and ostensibly, at least, premised its decision also upon the alternative basis that the trial court did not err in excusing Mr. Flowers. There simply is no *Witherspoon* issue before the Court unless a death sentence has been imposed. *Bumper v. North Carolina,* (1968) 391 U.S. 543, 544, 88 S.Ct. 1788, 1790, 20 L.Ed.2d 797, 800, *Shack v. State,* (1972) 259 Ind. 450, 460, 288 N.E.2d 155, 162. To the extent that the majority purports to hold that *Witherspoon* was not violated, it unnecessarily risks misleading the bench and bar, as that portion of the opinion can have no effect upon future cases.

I do not necessarily agree that the trial judge acted properly in excusing certain prospective jurors by reason of indicated bias against death sentences. The quotation from *Adams v. Texas,* (1980) 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581, i.e., "We repeat that the State may bar from jury service those whose beliefs about capital punishment would lend them to ignore the law or violate their oaths.", although applicable in that case, may be misplaced in the case at bar.

Under our statutory provisions, the recommendation of the jury upon the punishment issue is not binding upon the court. The jury's determination, therefore, does not have the critical effect that it has in Texas, although in *Witherspoon,* the Court stated, " * * * but nothing in our decision turns upon whether the judge is bound to

follow (the jury's) recommendation." 391 U.S. at 518 n. 12, 88 S.Ct. at 1775 n. 12, 20 L.Ed.2d at 783 n. 12. Additionally, the wording of the Indiana Statute, Ind.Code § 35–50–2–9(e) (Burns 1979) does not appear to bind the conscience of the jurors but provides only that the jury *may* recommend the death penalty under certain prescribed circumstances. It is not altogether illogical to conclude, therefore, that although a juror finds facts warranting the death penalty and no mitigating circumstances whatsoever, he *may,* nevertheless, recommend against imposing it without violating his oath. Under such an interpretation of the statute, Juror Flowers certainly did not unequivocally indicate that his feelings about the death penalty could, or would, interfere with the duties imposed upon him by his oath and the death penalty statute.

Unquestionably the State is entitled to a jury composed only of such persons who can abide by their oaths to follow the law and thus would not let their personal convictions in opposition to the death penalty control their votes upon the guilt or innocence of the defendant or upon any other issue of fact. However, whether, under our statute, which only *permits* the imposition of a death sentence under some circumstances and does not require it under any, and which renders the verdict advisory only, the State is entitled to a jury all members of which could, under some circumstances, recommend a death sentence, is a question which, to my knowledge, has not been answered. It is not necessary to answer it to resolve the case before us, and I leave it for another day.

HUNTER, J., concurs.