**Obadyah BEN–YISRAYL, f/k/a Christopher Peterson, Appellant (Petitioner Below),**

v.

**STATE of Indiana, Appellee (Respondent Below).**

No. 45S00–9708–PD–460.

Supreme Court of Indiana:

May 25, 2000.

Susan K. Carpenter, Public Defender of Indiana, Steven H. Schutte, Emily Mills Hawk, Deputy Public Defenders, Indianapolis, Indiana, Attorneys for Appellant.

Karen Freeman–Wilson, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

SHEPARD, Chief Justice.

Appellant Obadyah Ben–Yisrayl, formerly known as Christopher D. Peterson, was convicted of two counts of murder for killing Ilija (Eli) and George Balovski in their tailor shop in Gary, Indiana. The jury found him guilty, and the trial court imposed the death penalty. Ben–Yisrayl appealed his convictions and sentence, and we affirmed. *Peterson v. State,* 674 N.E.2d 528 (Ind.1996), *cert. denied,* 522 U.S. 1078, 118 S.Ct. 858, 139 L.Ed.2d 757 (1998). The trial court subsequently denied his petition for post-conviction relief. He now appeals that denial. We affirm.

On the afternoon of December 18, 1990, the Balovski brothers were found dead inside their tailor shop from shotgun wounds to the head. A sawed-off shotgun later recovered from Ben–Yisrayl's apartment fired a spent casing found at the scene. Ben–Yisrayl made incriminating admissions to an acquaintance and gave a formal statement to the police admitting the shootings. *Id.* at 532.

These two deaths were allegedly part of a shotgun shooting spree in northwestern Indiana involving at least ten victims. (*See* Appellant's Br. at 50.) Ben–Yisrayl was charged in five separate informations four for murder, and one for robbery and attempted murder. Of the four murder trials, Ben–Yisrayl was found guilty in two and not guilty in two. These different results are part of the basis upon which he brings his current appeal.

Ben–Yisrayl raises several issues for our review, which we restate as:

I. Whether he was denied effective assistance of counsel at pre-trial proceedings when his counsel elected not to seek a change of venue;

II. Whether he was denied effective assistance of counsel at trial;

III. Whether he was denied effective assistance of counsel during the penalty phase when his counsel presented no mitigating evidence in the sentencing hearing before the judge;

IV. Whether the trial court erred in imposing the death penalty in light of the jury's recommendation to the contrary; and

V. Whether alleged errors in the jury instructions amounted to fundamental error.

### Standard of Review for Post–Conviction

Post-conviction procedures do not afford convicts the opportunity for a "super-appeal." *Benefiel v. State,* 716 N.E.2d 906, 911 (Ind.1999). Rather, they create a narrow remedy for subsequent collateral challenges to convictions. *Id.* Petitioners must establish their grounds for relief by a preponderance of the evidence. Ind. Post–Conviction Rule 1(5). A petitioner appealing the denial of post-conviction relief labors under an even heavier burden:

On appeal [from the denial of post-conviction relief], petitioner stands in the position of one appealing from a negative judgment. In such cases, it is only where the evidence is without conflict and leads to but one conclusion, and the trial court has reached the opposite conclusion, that the decision will be disturbed as being contrary to law.

*Fleenor v. State,* 622 N.E.2d 140, 142 (Ind. 1993), *cert. denied,* 513 U.S. 999, 115 S.Ct. 507, 130 L.Ed.2d 415 (1994). Such a petitioner must show that the evidence, taken as a whole, "leads unerringly and unmistakably to a conclusion opposite to that reached by the trial court." *Weatherford v. State,* 619 N.E.2d 915, 917 (Ind.1993).

 In the present case, the post-conviction court entered findings of fact and conclusions of law in accordance with Indiana Post–Conviction Rule 1(6). A post-conviction court's findings and judgment will be reversed only upon a showing of clear error – "that which leaves us with a definite and firm conviction that a mistake has been made." *State v. Moore,* 678 N.E.2d 1258, 1261 (Ind.1997), *cert. denied,* 523 U.S. 1079, 118 S.Ct. 1528, 140 L.Ed.2d 678 (1998). In short, the question before us is whether "there is any way the trial court could have reached its decision." *Id.*

### Standard of Review for Ineffective Assistance

 We analyze ineffective assistance of counsel claims under the two-part test announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Benefiel,* 716 N.E.2d at 912. To succeed, the petitioner must demonstrate both deficient performance and resulting prejudice. *Id.* A deficient performance is that which falls below an objective standard of reasonableness. *Douglas v. State,* 663 N.E.2d 1153 (Ind.1996). Prejudice exists when "there is a reasonable probability that the result of the proceeding would have been different but for defense counsel's inadequate representation." *Cook v. State,* 675 N.E.2d 687, 692 (Ind.1996).

 Furthermore, counsel's performance is presumed effective, and a petitioner must offer strong and convincing evidence to overcome this presumption. *Benefiel,* 716 N.E.2d at 912. The standard of review for a claim of ineffective assis-

tance of appellate counsel is the same as for trial counsel. *Trueblood v. State,* 715 N.E.2d 1242 (Ind.1999).

Of course, a capital defendant in this state also receives the protection of Indiana Criminal Rule 24. We are now in the tenth year of the operation of Rule 24. It creates minimum standards for the criminal litigation experience, specialized training, compensation, and caseload of lawyers appointed in capital cases. Both prosecutors and defense counsel agree that "Rule 24 ha[s] led to improved representation by defense lawyers in capital cases." Norman Lefstein, *Reform of Defense Representation in Capital Cases: The Indiana Experience and Its Implications for the Nation,* 29 Ind. L.Rev. 495, 509 (1996). "[A] death penalty verdict returned [since the advent of Rule 24 is] more likely to be sustained on appeal, and the appellate court [is] less apt to find that defense counsel was ineffective." *Id.* at 509. Ben–Yisrayl's counsel were appointed under the requirements of this rule. *Compare* Ind. Criminal Rule 24 (effective Jan. 1, 1990) *with* (T.R. at 3, 12) (counsel appointed Mar. 4, 1991).

Moreover, for more than half a century, Indiana has offered state-financed legal assistance to prisoners seeking post-conviction relief. Ind.Code Ann. § 33–1–7–1 (West 1996) (office of Public Defender created 1945). Funded at 5.6 million dollars in the current year, this state office employs a substantial contingent of lawyers specializing in capital collateral litigation. These lawyers have funds at their disposal for mitigation specialists, DNA tests, mental health professionals, and the like. It is these lawyers who have brought the present petition for Ben–Yisrayl.

### I. Ineffective Assistance of Counsel—Pre–Trial

 Ben–Yisrayl claims that his trial counsel should have sought a change of venue from Lake County due to allegedly prejudicial pre-trial publicity.[1] (Appellant's Br. at 50.)

1. Ben–Yisrayl also raises this issue as a free- standing claim under Post–Conviction Rule 1.

"A defendant is entitled to a change of venue upon a showing that jurors are unable to disregard preconceived notions of guilt and render a verdict based on the evidence." *Moore*, 678 N.E.2d at 1262. The decision to seek a change of venue is generally a matter of trial strategy that we will not second-guess on collateral review. *Id.*

Appellant acknowledges that his trial counsel had already secured two acquittals in Lake County before the trial of this cause commenced. (Appellant's Br. at 59.) Appellant had also been tried for two murders in an adjacent county, Porter County, and had been sentenced to death. (*Id.* at 52 (citing P–C.R. at 3113–18).) We think it reasonable strategy for Ben–Yisrayl's counsel to have elected to keep the trial in Lake County, the locale of two acquittals, rather than seeking to have it moved elsewhere.

Ben–Yisrayl argues that the negative media and public reaction to the two acquittals in Lake County and the positive reactions to the conviction in Porter County exacerbated pre-existing sentiment in favor of conviction. (*Id.*) We have held that counsel was not ineffective for electing not to seek a change of venue where there is insufficient evidence to conclude the defendant could not have received a fair trial in the county in which the case was tried. *Moore*, 678 N.E.2d at 1262. Such is the case here.

While there was extensive publicity on the shotgun shootings, Ben–Yisrayl has failed to prove that the jurors maintained preconceived notions of guilt and were unable to render a verdict based on the evidence. All of the jurors stated they would be fair and impartial,[2] and the trial court continuously admonished them to steer clear of media coverage of the trial.[3] Moreover, the jury that heard the case eventually recommended a term of years rather than the death penalty, hardly a sign that they had been poisoned against Ben–Yisrayl.

Ben–Yisrayl's counsel were not ineffective on this basis.

## II. Ineffective Assistance of Counsel—Guilt Phase

Ben–Yisrayl claims that he was denied effective assistance of trial counsel for several reasons, which we address in turn.

*A. Witness Testimony.* Ben–Yisrayl first claims that his trial counsel were ineffective for failing to call a witness he claims would have offered exculpatory evidence.

Before his trial on the Balovski murders, Ben–Yisrayl was tried separately in three trials for other murders thought to be part of the same shooting spree. He was acquitted in two trials, but was ultimately convicted for the Balovski murders. In his two acquittal trials, the defense presented evidence of the presence of a "light-skinned man" seen in the general vicinity of the crimes.[4] According to an affidavit given by Patrick Fleming, part of the post-conviction record, a man fitting this de-

---

(Appellant's Br. at 50.) Because this issue "was known and available but not raised on appeal, it is waived." *Rouster v. State*, 705 N.E.2d 999, 1003 (Ind.1999). We therefore address this claim only as it reflects on the performance of counsel.

He also claims that his counsel should have "at least" sought a change of venire. He fails to support this contention with argument. In accordance with the Rules of Appellate Procedure, we will not address claims without argument. Ind. Appellate Rule 8.3(A)(7) ("Each error that appellant intends to raise ... shall be set forth specifically and followed by the argument applicable thereto.").

2. (T.R. at 544, 697, 886–87, 890, 1053, 1061, 1088, 1155, 1212, 1222, 1228, 1231, 1391–93, 1422–23, 1427, 1435, 1519, 1582, 1585, 1588–89, 1880, 1953–57, 1965–66, 2027, 2056–57, 2061, 2205, 2208, 2300, 2329, 2341, 2343, 2368, 2370, 2379, 2411, 2427–28.)

3. (T.R. at 3170–86, 3475, 3502–04, 3797–3817, 3818–20, 4115–19, 4260–63, 4272, 4449–4451.)

4. Ben–Yisrayl describes himself as a "dark-skinned black man." (Appellant's Br. at 16.)

scription was near the Balovski tailor shop on the afternoon of the murders. Ben–Yisrayl argues that his trial counsel's failure to call Fleming to present this evidence at trial constituted ineffective assistance.[5]

In Fleming's affidavit, he says that at 4:10 or 4:20 p.m. on the afternoon of the murders, he went to Eli Balovski's tailor shop to drop off some clothes. As he was leaving, he made a U-turn and drove past a car sitting across the street from the tailor shop. He noticed a man sitting in the car, and described the man as "white" with dark, short hair and "dark eyes." (P–C.R. at 2004.) As he was driving past, he saw the man reach between his legs to make "sure [Fleming] couldn't see what he had there." (Id.) Fleming thought the man had a gun. (Id.) Fleming also thought the man resembled a police composite sketch of the Balovski murder suspect, which had been published in area newspapers. (Id.)

▆▆ Assuming for the sake of argument that effective lawyering would mean calling Fleming, this Court will not declare counsel ineffective for failure to call a particular witness absent a clear showing of prejudice. *Grigsby v. State*, 503 N.E.2d 394 (Ind.1987). The bulk of Ben–Yisrayl's claim of prejudice rests on the fact that he was acquitted in two trials where evidence of a "light-skinned man" was presented, but convicted in a trial where this evidence was not. We decline, however, to attach this much significance to the acquittals.

The evidence presented at the first two trials regarding another possible shooter was much more compelling than that presented in Fleming's affidavit. In one case, an eyewitness testified that she was sitting in the victim's car when the victim was shot, and observed the shooter standing next to the car window. She described the shooter as a "light complected male wearing a trench coat." (P–C.R. at 2360.)

In another case, two witnesses testified that they were driving down the street when they observed a "white male with long hair and a trench coat" walking toward a car parked near an ATM. (P–C.R. at 2361.) They also testified that the man was carrying a "cylindrical object parallel to his leg." (Id.) After passing the man, they drove another one hundred feet, then heard "the blast of two shotgun shells." (Id.)

These witnesses thus were able to link the "light-skinned" man to the shootings (indeed, in one case, a witness identified a man fitting this description as the shooter). By contrast, Fleming's observations do not place anyone at the crime scene at the time of the shooting. Rather, Fleming places someone across the street a half hour before the shootings. Although Fleming claims that he thought the man had a gun in his lap, he did not actually see a gun.

There was substantial evidence against Ben–Yisrayl. Antwion McGee, a friend of Ben–Yisrayl's, testified that when he learned that "the shotgun killer" had killed the Balovskis, he called Ben–Yisrayl about the murders. (T.R. at 3366, 3368.) At that time, Ben–Yisrayl told McGee "[t]hat he had got 'em." McGee said, "Got who?" and Ben–Yisrayl replied that he had "got 'em and then he would come by to get [McGee]." (T.R. at 3368–69.) McGee later met Ben–Yisrayl and Ben–Yisrayl told him "[t]hat he had got the guys at the tailor shop." (T.R. at 3369.) Ben–Yisrayl then gave McGee a detailed account of the murders. (T.R. at 3369–70.) McGee also saw a shotgun in Ben–Yisrayl's bedroom closet. (T.R. at 3085–87, 3373.)

---

5. At the time of the post-conviction hearing, there was some disagreement between the parties as to whether Ben–Yisrayl's counsel had been provided with Fleming's affidavit and police statement. The post-conviction court found that the evidence had been disclosed. On appeal from the denial of post-conviction relief, Ben–Yisrayl does not dispute this finding and, therefore, does not put forth a claim under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

McGee later told the police that Ben–Yisrayl was the person who had killed the Balovskis. (T.R. at 3376–77.) After receiving this information, the police searched Ben–Yisrayl's closet and found the shotgun. (*See* T.R. at 3273.) Test results indicated that the shotgun found in Ben–Yisrayl's closet fired a spent shell casing recovered at the site of the Balovski killings. (T.R. at 3119–20.)

After being taken into custody, Ben–Yisrayl confessed to shooting the Balovskis. (T.R. at 2911.) He gave a detailed account of the shootings, indicating that he had entered the tailor shop, had gone downstairs and shot someone, and had then gone upstairs to shoot another person. (T.R. at 4632.)

Based on the foregoing, it is difficult to imagine that Ben–Yisrayl would have been acquitted but for counsel's failing to call Fleming as a witness. Ben–Yisrayl's claim about Fleming's testimony certainly does not unerringly or unmistakably lead to a conclusion contrary to that reached by the post-conviction court. *See Weatherford,* 619 N.E.2d at 917.

■ *B. Expert Testimony About False Confessions.* Ben–Yisrayl also says that his counsel were ineffective for failing to call an expert witness to testify about the existence of and reasons behind "false confessions."[6] (Appellant's Br. at 26.)

At the post-conviction hearing, Ben–Yisrayl presented an affidavit from Dr. Richard Ofshe, an expert in sociology and psychology who has testified in other courts regarding the "mechanisms of control and influence" in police interrogations. (P–C.R. at 3127–28.) Having reviewed Ben–Yisrayl's case, Ofshe said that he believed Ben–Yisrayl's confession was indicative of a false confession. (P–C.R. at 3133.) This belief was based on Ofshe's opinion that certain facts given in Ben–Yisrayl's statement were inconsistent with facts presented at trial. (P–C.R. at 3132.)

After examining Ofshe's statement, we cannot conclude that expert testimony regarding false confessions would have led to a conclusion opposite that reached by the trial court. At trial, Detective Reynolds, who conducted Ben–Yisrayl's interrogation, was vigorously cross-examined about inconsistencies between Ben–Yisrayl's statement and the facts presented at trial. For example, Ben–Yisrayl said in his statement that he parked his car in front of the tailor shop. This fact, however, was not corroborated by any other witnesses. (T.R. at 2971–72.) Reynolds was also questioned about a discrepancy between Ben–Yisrayl's statement and other witness statements regarding whether money had been stolen from the Balovskis. (*See* T.R. at 2994–95.) Lastly, Reynolds was extensively cross-examined regarding the amount of detail, or lack thereof, in Ben–Yisrayl's statement. (T.R. at 2976–87.)

Ben–Yisrayl has made no showing that expert testimony regarding false confessions would have led to an acquittal. No ineffectiveness has been shown here. *See Drake v. State,* 563 N.E.2d 1286, 1290 (Ind. 1990).

*C. Admission of the Shotgun.* At trial, the State introduced into evidence a shotgun that was seized from Ben–Yisrayl's bedroom closet. This shotgun was linked to the shootings. Ben–Yisrayl now contends that the shotgun was wrongfully seized and that his trial counsel were ineffective in failing to raise and preserve this issue at trial. By failing to preserve this issue, Ben–Yisrayl claims, his appellate counsel were unable to assert the issue on direct appeal, "where relief would have been granted." (Appellant's Reply Br. at 7.)

■ The shotgun in question was seized in conjunction with a search of Ben–Yisrayl's mother's residence. The trial court admitted the shotgun after finding that the firearm was openly visible and

---

**6.** Ben–Yisrayl does not contest the admissibility of his confession. This issue was already raised and resolved on direct appeal. (Appellant's Br. at 27.)

that the officers had probable cause to believe it was "sawed-off," and thus contraband. *Peterson,* 674 N.E.2d at 535. Ben–Yisrayl now maintains that the shotgun was not contraband because it does not fall under the statutory definition of a sawed-off shotgun.

Under Ind.Code § 35–47–5–4.1, it is illegal to possess a sawed-off shotgun. A sawed-off shotgun is:

(1) a shotgun having one (1) or more barrels less than eighteen (18) inches in length; and

(2) any weapon made from a shotgun (whether by alteration, modification, or otherwise) if the weapon as modified has an overall length of less then twenty-six (26) inches.

Ind.Code Ann. § 35–47–1–10 (West 1986) (formerly Ind.Code § 35–23–9.1–1; repealed and recodified 1983).

At Ben–Yisrayl's trial, Officer John Pruzin testified that the firearm seized from Ben–Yisrayl's closet measured twenty-six and a half inches, but had a barrel of only sixteen or sixteen and a half inches. (T.R. at 3103.) Ben–Yisrayl contends that because the shotgun does not meet part two of the statute, it is excluded from the definition of sawed-off shotgun.

In *Brook v. State,* 448 N.E.2d 1249 (Ind. Ct.App.1983), our Court of Appeals examined the statute defining sawed-off shotgun. The statute was then found at Ind. Code § 35–23–9.1–1 and read:

"Sawed-off shotgun" means a shotgun having one (1) or more barrels less than eighteen (18) inches in length and any weapon made from a shotgun (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than twenty-six (26) inches.

The defendant Brook challenged his conviction for possessing a sawed-off shotgun because his shotgun had been modified to have a 15 and ⅞ inch barrel, but was still twenty-nine inches in length. Brook argued that the use of the conjunction "and"

in the statute mandated that the shotgun both have a barrel less than eighteen inches and be less than twenty-six inches in length. *Id.* at 1250–51. The court disagreed, holding that the language of the statute does not set forth a single definition of sawed-off shotgun with two requirements. Rather, the barrel and length limits are two independent considerations. *Id.* at 1251.

Ben–Yisrayl's present counsel argue that the 1983 recodification of the handgun definition effectively overruled *Brook* by re-enacting the same words displayed on the printed page as two subparagraphs rather than as one large one. Although the statute was recodified, we cannot conclude that this indicated a legislative response to *Brook* since the legislature approved the change in the statute approximately one month before *Brook* was decided. *Compare* Pub. Law No. 311–1983, Sec. 32 (approved April 22, 1983) *with Brook,* 448 N.E.2d 1249 (1983).

Ben–Yisrayl's trial counsel were not providing substandard legal assistance by failing to make such a contention.

 *D. Jury Instructions.* Ben–Yisrayl claims that alleged errors in the jury instructions warranted the granting of post-conviction relief. Ben–Yisrayl did not object to any of the instructions he now wishes to challenge. Instruction errors are generally unavailable on appeal unless proper specific objections are made at trial. *Winegeart v. State,* 665 N.E.2d 893 (Ind.1996). With the exception of ineffective assistance of counsel, which may be raised on either direct appeal or in post-conviction proceedings, if an issue was known and available but not raised on direct appeal, it is waived. *Benefiel,* 716 N.E.2d at 911. We therefore review these subclaims for ineffective assistance of counsel.

 *1. Mens Rea.* Ben–Yisrayl claims that Final Instruction 3 inadequately defines the mental states "knowingly" and "intentionally." (Appellant's Br. at 39.)

He argues that, because the instruction seems to apply the states of mind to Ben–Yisrayl's conduct, rather than the consequence of his conduct, the definitions are incomplete. (*Id.*)

The instruction in question defined the terms "knowingly" and "intentionally" precisely as they are defined by statute. *See* Ind.Code Ann. § 35–41–2–2(a), (b) (West 1986). Moreover, when those definitions are read immediately after the definition of murder, as they were in Instruction 3, they more than clearly indicate that the mental states must be applied to the result of killing, rather than the act of shooting. The instruction as a whole provides:

> MURDER is defined by Statute in Indiana in pertinent part as follows:
>
> A person who *knowingly or intentionally kills* another human being commits Murder, a felony.
>
> A person engages in conduct "intentionally" if, when he engages in the conduct, it is his conscious objective to do so. A person engages in conduct "knowingly" if, when he engages in the conduct, he is aware of a high probability that he is doing so.

(T.R. at 382 (emphasis added).)

In effect, Ben–Yisrayl says his lawyers should have contended that this instruction does not require, say, intentional conduct aimed at the outcome of death. Ben–Yisrayl acknowledges that *Andrews v. State*, 441 N.E.2d 194 (Ind.1982), bears upon this claim of error. (Appellant's Br. at 41.) *Andrews* states that "[i]t is well-settled that the necessary intent to commit murder may be inferred from the intentional use of a deadly weapon in a manner likely to cause death." *Andrews*, 441 N.E.2d at 201.

Ben–Yisrayl's counsel were not deficient for failing to make this argument.

**2. Reasonable Doubt.** Ben–Yisrayl claims that Final Instruction 6 inadequately defines reasonable doubt. (Appellant's Br. at 42.) He argues that the instruction misassigned the burden of proof when it informed the jury that a reasonable doubt is one that "arises," rather than "remains," in a juror's mind after she or he has heard all the evidence. (*Id.*) He contends that reasonable doubt does not necessarily derive from the evidence, but instead persists if the State has not defeated it. (*Id.*)

We decided this very issue long before Ben–Yisrayl's lawyers tried his case, in *Hoskins v. State*, 441 N.E.2d 419 (Ind. 1982).[7] Hoskins objected to the word "arises" in a reasonable doubt instruction because he claimed the word did not recognize that doubt could be created from the beginning of the case or notwithstanding the case. *Id.* at 425. Like Ben–Yisrayl, he suggested the word "remains" as a replacement, among other possibilities. *Id.*

The challenged instruction is indistinguishable from those regularly given by trial courts and approved by appellate courts in Indiana. *Id.* at 425–26. We have held that the instruction sets out "the proper manner in which a juror is to consider reasonable doubt[, because a] doubt cannot arise from some fact or circumstance outside the evidence or something in the juror's mind that is not based upon an impartial consideration of all the evidence and circumstances." *Id.* at 426; *see also Conner v. State*, 711 N.E.2d 1238, 1246–47 (Ind.1999) (holding that "arises" reasonable doubt instruction, when read with other instructions, does not erroneously inform jury regarding presumption of innocence), *pet. for cert. filed*, April 7, 2000; *but cf. Winegeart*, 665 N.E.2d at 901–03 (criticizing other aspects of a similar reasonable doubt instruction).

---

**7.** Instruction 6 in the present case is identical to the instruction challenged in *Hoskins*. It states in relevant part: "A 'reasonable doubt' is a fair, actual, and logical doubt that arises in your mind after an impartial consideration of all of the evidence and circumstances in the case." (T.R. at 385); *Hoskins*, 441 N.E.2d at 425.

The instruction is proper. Ben–Yisrayl's counsel were not deficient.

■ *3. Truthfulness of Witnesses.* Ben–Yisrayl claims that Final Instruction 16 improperly shifted the burden of proof to the defense by informing the jury that it should "reconcile the evidence ... upon the theory that each and every witness has spoken the truth." (Appellant's Br. at 44 (quoting T.R. at 395).) He argues that jurors should have additionally been instructed to carefully assess the testimony of those with corrupt motives. (*Id.* at 44–45.) They were. Instruction 16 further provides,

> You may take into consideration [witnesses'] conduct and demeanor while testifying; their interest, if any[,] or want of interest in the result of the trial; their motive, if any, in testifying; their relation to or feeling for or against the defendant, the alleged victim or the state of Indiana; the probability or improbability of their statements; their opportunity to observe and know of the matters of which they testify; and any factors in evidence which in your judgment may affect their testimony.

(T.R. at 395.)

Additionally, we have previously held presumption of truthfulness instructions to be proper. *Timberlake v. State,* 690 N.E.2d 243, 258–59 (Ind.1997) (citing *Holmes v. State,* 671 N.E.2d 841, 858 (Ind. 1996); *Lottie v. State,* 273 Ind. 529, 535, 406 N.E.2d 632, 637 (1980)), *cert. denied,* 525 U.S. 1073, 119 S.Ct. 808, 142 L.Ed.2d 668 (1999); *see also Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973) (holding that a similar instruction did not violate the Due Process Clause of the 14 th Amendment).

Ben–Yisrayl's counsel were not deficient on this basis.

### III. Ineffective Assistance of Counsel—Penalty Phase

■ Ben–Yisrayl argues that his counsel were ineffective at the penalty phase because they did not present any mitigating evidence at the sentencing hearing before the judge. (Appellant's Br. at 48.) He tendered evidence to the post-conviction court that he claims would have convinced the trial court to sentence him to a term of years, rather than to death. Specifically, he cites the affidavits of his ex-girlfriend, (P–C.R. at 2524–27), a friend's mother, (P–C.R. at 2529–31), and an administrator at his high school, (P–C.R. at 2535–38).[8]

The post-conviction evidence was substantially the same as that which was presented during the penalty phase of the jury trial and thus heard by the jury. (T.R. at 4505, 4514–55.) Two jail guards, a good friend, the mother of his children, and his mother testified on Ben–Yisrayl's behalf.[9] (*Id.*)

The similarities in witnesses and subject matter are such that Ben–Yisrayl has not shown his trial counsel's performance fell

---

8. These women testified that Ben–Yisrayl is popular, personable and outgoing, logical and intelligent, respectful and polite, clean and neat, and responsible. They affirmed that he has a good relationship with his family, and more specifically with his mother. All three stated that he is not a violent person, and that they feel he is innocent of the crimes. Finally, each woman stated that he is not racist, and that he has dated women of different races. (P–C.R. at 2524–38.)

9. Witnesses testified in the sentencing recommendation hearing that Ben–Yisrayl is neat, clean, responsible, and polite. (T.R. at 4516, 4519, 4548.) They said he is not a trouble-maker, he doesn't do inappropriate things on dates, and he didn't use drugs or abuse alcohol. (T.R. at 4516, 4519, 4523–24.) He took care of his brothers and sisters as a teenager, and he took care of his children as an adult. (T.R. at 4533, 4538, 4541–42.) He has a close relationship with his mother. (T.R. at 4547–49.) His mother, the mother of his children, and his friend all testified that he is not violent, and that they believe him to be innocent of the crimes. (T.R. at 4524, 4528, 4534, 4535.) Finally, his mother testified that he is not racist, and that he has friends of all races. (T.R. at 4548.)

below reasonable standards.[10]

■ Ben–Yisrayl also claims that information contained in the affidavits could have been used at trial to bolster a residual doubt claim. (Appellant's Br. at 49 (citing P–C.R. at 2524–27, 2529–31).) As we stated in *Miller v. State,* 702 N.E.2d 1053, 1069 (Ind.1998), *cert. denied,* —— U.S. ——, 120 S.Ct. 806, 145 L.Ed.2d 679 (2000), "We find such a claim too attenuated to serve as a ground for ineffective assistance of counsel. In our view, counsel ought have no obligation to argue to the jury that its just-returned unanimous determination of guilt ought to be revisited." The failure to present evidence of residual doubt at the penalty phase was not ineffective assistance of counsel.

### IV. Propriety of Death Sentence

On direct appeal, Ben–Yisrayl challenged the constitutionality of Ind.Code § 35–50–2–9, which allows the trial court to make final sentencing determinations, despite the jury's recommendation to the contrary. Ben–Yisrayl also challenged the propriety of the death sentence as applied in his case. *Peterson,* 674 N.E.2d at 539. We held that our statutory system of jury recommendation and judicial decision does not violate our Constitution. *Id.* at 540–42.

■ Today, Ben–Yisrayl seeks to establish that when the General Assembly wrote, "The court is not bound by the jury's recommendation,"[11] it meant the sentencing court was bound by a recommendation if it was a recommendation for a term of years. The post-conviction court held for the State on this claim, saying it was res judicata. It was not res judicata. Rather, it was available on direct appeal and thus not available as a claim in this collateral proceeding.

**Conclusion**

Accordingly, we affirm the decision of the post-conviction court.

DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.

10. In fact, the only evidence Ben–Yisrayl now proffers that the sentencing judge did not hear is that a school administrator thought he was logical and intelligent, that he gave her a school picture when he graduated from high school, that he has always sent his friend's mother a birthday card, and that he was always welcome in her home. (P–C.R. at 2529–30, 2536–37.)

11. Ind.Code Ann. § 35–50–2–9(e) (West Supp. 1990).