## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 19 2019, 8:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Laura L. Volk
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian A. McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

James Fernbach,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent.*

February 19, 2019

Court of Appeals Case No.
18A-PC-1065

Appeal from the Ripley Circuit Court

The Honorable Jeffrey Sharp, Special Judge

Trial Court Cause No.
69C01-1206-PC-1

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Petitioner, James Fernbach (Fernbach), appeals the post-conviction court's denial of his petition for post-conviction relief.

We affirm.

# ISSUE

Fernbach raises three issues on appeal, which we consolidate and restate as the following single issue: Whether Fernbach was denied the effective assistance of Trial Counsel.

# FACTS AND PROCEDURAL HISTORY

The relevant facts, as in this court's opinion issued in Fernbach's direct appeal, are as follows:

> Fernbach has a long history of mental illness. He has struggled with depression since elementary school, was committed to an institution when he was a teenager, and attempted suicide when he was sixteen years old. Fernbach has also had some history of violent behavior. When he was a young man, he fathered a child with a girlfriend, with whom he had a volatile relationship. Fernbach was arrested several times, for domestic violence, for threatening his girlfriend with an axe, for trying to strangle her, and for destroying items in their residence.
>
> Fernbach later married his wife, Susan. In the fall of 2008, Fernbach began to have paranoid delusions. At one point, he fired a shotgun into the woods near his home, claiming that he was shooting at intruders. After this incident, his family members removed firearms from his home. Fernbach still

displayed symptoms of his paranoia, including barricading the sliding door and windows of his home and putting nails in his gutters to prevent anyone from getting on his roof.

On a family vacation in September of that year, Fernbach thought his car was being followed. His family took him to an emergency room at a hospital in North Carolina, where he was prescribed anti-anxiety medication and told to see a mental health professional. Fernbach's symptoms did not improve, and he even went so far as to have family members taste his food to assure that it had not been poisoned. After Fernbach returned from vacation with family, he was taken to the emergency room at the Decatur County hospital. He was again treated for anxiety and released.

In October of 2008, Fernbach's family had him involuntarily committed at the University of Cincinnati hospital for seventy-two hours. There, Fernbach was diagnosed with bipolar disorder with psychotic tendencies. Nevertheless, he was released from the hospital after the seventy-two hour[s] hold and continued to have delusions that people were talking about him and threatening his family.

Shortly after being released from the hospital in Cincinnati, Fernbach overdosed on Tylenol pills and was taken to the emergency room. Fernbach's wife therefore took him to [Centerstone], a mental health facility in Batesville. [Centerstone] personnel diagnosed Fernbach with bipolar disorder and also stated he possibly suffered from schizophrenia. [Centerstone] monitored Fernbach and attempted to treat his problems with medication. Still, Fernbach continued to suffer from paranoid delusions, and eventually, he illegally purchased a handgun in Cincinnati.

On April 4, 2009, Fernbach went to a gas station and convenience store in Batesville. After talking to the cashier, he walked back out into the parking lot. There, he approached a vehicle belonging to Philip and Roberta Cruser, who had stopped at the station on their way to Cincinnati. When Mrs. Cruser entered the car after paying for fuel, Fernbach raised his two-shot derringer pistol to Mr. Cruser's head and shot him behind the ear. Fernbach then turned and saw Benjamin Dick. Fernbach walked toward Dick and raised the gun toward Dick's head. Dick grabbed Fernbach's arm in an attempt to defend himself. Fernbach was able to break free from Dick's grip and fired at Dick's head. The shot instead passed through Dick's hand and narrowly missed his head. As Dick lay on the ground, Fernbach tried to kick him in the head. Fernbach then started to reload the pistol with ammunition he had in his pocket. Dick tried to persuade Fernbach not to shoot him, saying, "man, . . . I've got kids . . . the cops are coming . . . you need to get the hell out of here." [] Fernbach then got in his vehicle and fled. A bystander followed Fernbach, who sped away at a high rate. Once Fernbach got home, he told his wife that he "thought [he] killed somebody on accident." []. Fernbach then called the police.

The police responded and apprehended Fernbach. Fernbach initially told the police that he had little recollection of what had occurred, claiming that he was in a "daze" but could remember "squeezing the trigger." [] Fernbach later claimed that Dick had attacked him and that he was merely defending himself. Specifically, Fernbach claimed that he fired his gun in the air and that Dick was "coming at [Fernbach]." [] Fernbach also stated that "the only thing I remember is swinging and hitting [Dick] and then him hitting the ground." []

* * *

Fortunately, neither of Fernbach's victims died. Mr. Cruser was gravely injured and suffers from severe disabilities as a result of

the gunshot wound to his head. Although Dick was not shot in the head, his hand was also severely injured[,] and he remains disabled.

*Fernbach v. State,* 954 N.E.2d 1080, 1089 (Ind. Ct. App. 2011) *trans. denied.*

[5] On April 6, 2009, the State filed an Information, charging Fernbach with two Counts of attempted murder. Fernbach pleaded not guilty by reason of insanity. On April 7, 2009, the trial court appointed Trial Counsel to represent Fernbach. On June 10, 2009, Trial Counsel filed a motion to determine if Fernbach was competent to stand trial and a notice of defense to mental disease or defect. On June 16, 2009, the trial court ordered Dr. Phillip Coons (Dr. Coons) and Dr. Robert Kurzhals (Dr. Kurzhals) to examine Fernbach's sanity and competency to stand trial.

[6] On October 26, 2009, a competency hearing was held. At the end of the hearing, the trial court decided that Fernbach was incompetent to stand trial. The trial court ordered Fernbach to be committed to the Department of Mental Health. On February 22, 2010, Logansport State Hospital, where Fernbach had been committed, notified the trial court that Fernbach was competent to stand trial.

[7] A jury trial commenced on January 11, 2011. The parties raised the idea of stipulating to Fernbach's medical records. The trial court interjected and asked the parties which records they were discussing, and Trial Counsel replied, "Well, there's an awful lot . . . I mean . . . There's [sic] medical records from several different places." (Trial Tr. Vol. II, p. 439). The State argued that it

would prefer the admission of all Fernbach's medical records. Following that argument, Trial Counsel responded by stating, "Okay. Uh, the only thing I ask, just so I don't get, so I don't get surprised by something, just give me a list first thing in the morning of the medical records that you want. You . . . don't have to tell me all the . . . particular records, just the places and I don't think I've got a problem with it. Because I think [Dr.] Kurzhals had almost all of them, if not all of them." (Trial Tr. Vol. II, p. 440). The following morning, Fernbach's medical records from "Logansport State Hospital, Margaret Mary Community Hospital, Tree City Medical, Decatur County Hospital, Dearborn County Hospital, Columbus Regional Hospital, Centerstone [], and University of Cincinnati Hospital" were stipulated to by the parties (Stipulated Packet). (Trial Tr. Vol. II, p. 448).

[8] Fernbach's jury trial concluded on January 18, 2011, and the jury found him guilty but mentally ill on the two Counts of attempted murder. On February 17, 2011, the trial court conducted a sentencing hearing. At the end of the hearing, the trial court sentenced Fernbach to consecutive thirty years on both Counts. Fernbach appealed.

[9] On appeal, Fernbach raised two issues: (1) whether the jury clearly erred in finding him guilty but mentally ill instead of not guilty by reason of insanity; and (2) whether his sentence was inappropriate. On October 7, 2011, we affirmed his convictions. On December 20, 2011, the Indiana Supreme Court denied transfer. On June 27, 2012, Fernbach filed a petition for post-conviction relief, which was later amended three times. On January 10, 2018, the post-

conviction court conducted an evidentiary hearing and denied Fernbach's petition.

Fernbach now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

Under the rules of post-conviction relief, the petitioner must establish the grounds for relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5): *Strowmatt v. State*, 779 N.E.2d 971, 974-75 (Ind. Ct. App. 2002). To succeed on appeal from the denial of relief, the post-conviction petitioner must show that the evidence is without conflict and leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id*. at 975. The purpose of post-conviction relief is not to provide a substitute for direct appeal, but to provide a means for raising issues not known or available to the defendant at the time of the original appeal. *Id*. If an issue was available on direct appeal but not litigated, it is waived. *Id*.

Further, the post-conviction court in this case entered findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1, § 6. "A post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Little v. State*, 819 N.E.2d 496, 500 (Ind. Ct. App. 2004) (quoting *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000), *reh'g denied*), *trans. denied*. In this review, findings of fact are accepted unless clearly

erroneous, but no deference is accorded to conclusions of law. *Id*. Additionally, we remind Fernbach that he is not entitled to a perfect trial, but is entitled to a fair trial, free of errors so egregious that they, in all probability, caused the conviction. *Averhart v. State*, 614 N.E.2d 924, 929 (Ind. 1993).

## II. *Ineffective Assistance of Counsel*

[13] Fernbach contends that he was denied the effective assistance of Trial Counsel. The standard by which we review claims of ineffective assistance of counsel is well established. In order to prevail on a claim of this nature, a defendant must satisfy a two-pronged test, showing that: (1) his counsel's performance fell below an objective standard of reasonableness based on prevailing professional norms; and (2) there is a reasonable probability that, but for counsel's errors the result of the proceeding would have been different. *Jervis v. State*, 28 N.E.3d 361, 365 (Ind. Ct. App. 2015) (citing *Strickland v. Washington*, 466 U.S. 668, 690, 694, (1984) *reh'g denied*), *trans. denied*. The two prongs of the *Strickland* test are separate and distinct inquiries. *Id*. Thus, "if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Timberlake v. State*, 753 N.E.2d 591, 603 (Ind. 2001) (quoting *Strickland*, 466 U.S. at 697) *reh'g denied*; *cert. denied*, 537 U.S. 839 (2002).

## A. *Failure to Object*

[14] To demonstrate ineffective assistance of counsel for failure to object, a defendant must prove that an objection would have been sustained if made and that he was prejudiced by counsel's failure to make an objection. *Wrinkles v.*

*State*, 749 N.E.2d 1179, 1192 (Ind. 2001), *cert. denied* (2002). Fernbach argues that Trial Counsel failed to object to (1) the inclusion of Dr. Kurzhals' deposition in the Stipulated Packet; (2) the highlights on several pages of the Stipulated Packet; and (3) the State's comments during closing arguments.

### 1. *Dr. Kurzhals' Deposition*

Although the parties agreed only to the stipulation of medical records in the Stipulated Packet, four other unapproved documents were included—*i.e.*, Dr. Kurzhals' deposition, Fernbach's competency report prepared by Dr. Kurzhals, Fernbach's sanity report prepared by Dr. Kurzhals, and a list of Fernbach's prior convictions. Fernbach appears to only challenge the inadvertent inclusion of Dr. Kurzhals' deposition, and he argues that had Trial Counsel objected, the trial court would have sustained the objection.

Turning to the record, after the State charged Fernbach with two Counts of attempted murder in April of 2009, in June 2009, Trial Counsel filed a motion to determine Fernbach's sanity and competency to stand trial. The trial court consequently ordered Dr. Coons and Dr. Kurzhals to evaluate Fernbach's sanity and competency. At the time, Fernbach was being held at the Logansport State Hospital where he was receiving treatment for his mental illness.

In August 2009, Dr. Kurzhals examined Fernbach, prepared an insanity and competency report, and subsequently testified at Fernbach's competency hearing in October 2009. Following that hearing, the trial court concluded that

Fernbach was incompetent to stand trial and was therefore returned to Logansport State Hospital. After several months, Logansport State Hospital informed the trial court that Fernbach was competent to stand trial.

[18] On August 11, 2010, Dr. Kurzhals' deposition was conducted. At his deposition, Dr. Kurzhals testified that the most important inquiry at the time was whether Fernbach appreciated the "wrongfulness" of his actions. (Tr. Exh. Vol. IV, p. 931). With respect to Fernbach's competency to stand trial, Dr. Kurzhals was "kind of on the fence because factually, [Fernbach] was able to answer most of the questions correctly." (Tr. Exh. Vol. IV, p. 848). However, Dr. Kurzhals "recommended that he be found incompetent" because Fernbach "seemed to be somewhat disillusioned about what happened, and [Dr. Kurzhals] didn't feel [that Fernbach] was at his optimum level of functioning." (Tr. Exh. Vol. IV, p. 848). Based on his observations and review, Dr. Kurzhals ultimately concluded that Fernbach either suffered from paranoid schizophrenia, schizoaffective disorder, or bipolar disorder with psychotic features. At Fernbach's jury trial, Dr. Kurzhals testified as follows:

> [A]s far as diagnosis, my diagnosis of him at the time was that he suffered from paranoid schizophrenia. Um, primarily because he was experiencing paranoid delusional beliefs. What that means is he had false beliefs that people were trying to harm him or his family when there was no evidence that anyone was, was attempting to do so. And the [] second sort of criteria for the insanity defense is that the illness or defect has to be so severe that the person didn't appreciate the wrongfulness of their conduct. Um, it is my opinion that in the mental state he was in at the time he was so paranoid, so delusional, so confused, that

he actually believed that these people were harming him and that he in the state of mind he was in at the time believed that he was defending his family or trying, or preventing harm from coming to his family.

(Trial Tr. Vol. IV, p. 937). The post-conviction court compared Dr. Kurzhals' deposition and trial testimony and found that

> the testimony given in the deposition regarding his evaluations was substantially similar to his trial testimony. The entire deposition is almost exclusively Dr. Kurzhals going through his report and identifying how he came to his conclusions. Further, Dr. Kurzhals' deposition promoted defendant's insanity defense. Although, it should not have been admitted, the [post-conviction] court finds that [Fernbach] was not unfairly prejudiced by its inadvertent inclusion. [Trial Counsel] was not deficient or ineffective for [not] objecting to their admission.

(PCR App. Vol. II, p. 248). We remind Fernbach that he is not entitled to a perfect trial, but is entitled to a fair trial, free of errors so egregious that they, in all probability, caused the conviction. *Averhart*, 614 N.E.2d at 929. In addition, if we can easily dismiss an ineffectiveness claim based upon the prejudice analysis, we may do so without addressing whether counsel's performance was deficient. *Law v. State*, 797 N.E.2d 1157, 1162 (Ind. Ct. App. 2003).

[19] Fernbach' defense at his trial was that he was not guilty by reason of insanity, and our review of Dr. Kurzhals' deposition shows it does not have a harmful effect on Fernbach's defense as Fernbach argues. To the contrary, if the jury considered the deposition it would have found Dr. Kurzhals' trial testimony regarding Fernbach's sanity to be supplemented, explained, and even

strengthened, by the deposition. Among other similar matters, the deposition explains Dr. Kurzhals' opinion that Fernbach was insane at the time he committed the offenses. Further, we note that Fernbach's medical reports were voluminous. In fact, the post-conviction court noted that Fernbach's medical records consisted of about 700 pages. Trial Counsel's testimony that he conducted a brief perusal of the Stipulated Packet on the morning of the trial, undermines Fernbach's assertion that Trial Counsel failed to look through the Stipulated Packet. Finding no prejudice, we affirm the post-conviction court.

## 2. *Admission of Highlighted Medical Records*

[20] Fernbach's second premise for his ineffective assistance of counsel claim is based on the claim that Trial Counsel did not object when the State used highlighted medical records to conduct its case-in-chief. The highlighted portions seemed to focus on Fernbach's use of illegal drugs and the fact these drugs contributed to Fernbach's psychosis and hallucinations.

[21] At the post-conviction hearing, Trial Counsel admittedly said that he should have objected to the State's use of highlighted copies of his medical records that had been extracted from the Stipulated Packet. Even if we assume without deciding that Trial Counsel's performance was deficient for not objecting to the admission of his highlighted medical records, Fernbach has failed to show the prejudice component of the *Strickland* standard and, therefore, cannot succeed on his ineffective assistance of counsel claim.

[22] At Fernbach's trial, the State called Fernbach's wife, Susan, to testify to her relationship with Fernbach, prior interaction with mental-health practitioners, and Fernbach's behavior both generally as well as before and after the shootings. Susan testified that Fernbach had never used illegal drugs, and that she had only seen him smoke marijuana once, before they were married in 2002 or 2003, and that his mental-health issues had begun in late 2007 or early 2008, resulting in treatment at various mental-health facilities. Susan testified that during a family vacation, Fernbach displayed signs of paranoia, and on their return, she said she took Fernbach to the University of Cincinnati Hospital where he was kept for several days, diagnosed as "bipolar with psychotic tendencies" and prescribed various medications. (Trial Tr. Vol. III, p. 629). Susan added that she ensured that Fernbach took his prescribed medicine, which appeared to work for a time until Fernbach became worse, at which point she took him to Centerstone for outpatient treatment.

[23] During redirect, Susan admitted that Fernbach had not seen a mental-health professional for three months before the shootings. She also claimed that while Fernbach had stopped taking two of his prescribed medications, he did so because a doctor had told him to stop taking them. Directing her attention to the fall of 2008, the State provided her with a copy of a record from the University of Cincinnati Hospital and directed her to read the "highlighted" part." (Trial Tr. Vol. III, p. 652). Susan read the part which said, "smoking marijuana made him paranoid." (Trial Tr. Vol. III, p. 652). Susan agreed that the medical report corresponded to her observations of Fernbach's mental

health worsening when Fernbach used drugs. The State then turned to another page of Fernbach's records, from Columbus Regional Hospital and asked Susan to read the "highlighted" section. (Trial Tr. Vol. III, p 654). Susan stated, "drug abuse," and a second highlighted portion which stated, "has not been honest with wife about drug use. Denies, minimizes drug problems." (Trial Tr. Vol. III, p 654). Reading from a medical record from Centerstone, Susan stated, "Um, it says he reports that he began to use marijuana a couple of weeks ago. He thought it might help his anxiety, but he states that it just seems to bump the anxiety up." (Trial Tr. Vol. III, p. 656). Susan agreed that the report was dated January 8, 2009, the same time during which Fernbach stopped visiting mental-health practitioners.

[24] During the State's case-in-chief, Dr. Kurzhals admittedly said that "smoking marijuana. . . can cause paranoia" in a person, however, he dispelled that being the only factor to be considered while making such a determination. (Tr. Vol. IV, p. 954). In fact, Dr. Kurzhals directed the State to look at a discharge form from one hospital which did not stress Fernbach's drug use as the reason for Fernbach's paranoia; rather, the hospital concluded that Fernbach's paranoia was due to his Bipolar diagnosis.

[25] In his brief, Fernbach argues

> The [State] sought to establish Fernbach's behavior and paranoia was due to his use of illegal drugs []. [The State] combed the over seven hundred pages of the stipulation packet and plucked five pages out that referenced Fernbach's illegal drug use []. The [State] copied those pages, highlighted the portions of each

mentioning Fernbach's drug use, and individually offered the highlighted pages into evidence a second time . . . The [State] sought to have the jury focus on the few extracted highlighted pages introduced in a much less cumbersome group rather than the entire stipulation packet containing all of Fernbach's mental health and medical records. Had [Trial Counsel] objected, the jury would have been left to review the unaltered seven hundred pages of original records, allowing it to have unbiased and accurate documents depicting Fernbach's mental health.

(Appellant's Br. p. 41). Fernbach contends that the State's use of highlighted pages extracted from the Stipulated Packet, without any objection from Trial Counsel, allowed undue emphasis on the State's evidence, and that he was prejudiced. In support of his claim of prejudice, Fernbach relied on our supreme court's holding in *Proctor v. State*, 584 N.E.2d 1089, 1091 (Ind. 1992).

[26] In *Proctor*, the defendant was charged with the murder of a fellow inmate during a prison riot. *Id*. After the jury appeared to be deadlocked in their deliberations, the trial court called the jury back at 2:30 a.m., and informed the jury that the defendant had moved for a mistrial and that it was prepared to grant the request. *Id*. at 1092. The jury was sent back for further deliberations. *Id*. After about forty minutes, the jury returned with a unanimous guilty verdict. *Id*. Our supreme court determined that by allowing the jury to return to deliberations and render a verdict after being informed that the defendant's counsel had moved for a mistrial and that the court was prepared to grant it, the judge allowed considerations of economy to outweigh the facilitation of the ascertainment of truth. *Id*. In vacating the defendant's conviction, our supreme

court determined that the trial court's comments had a prejudicial effect since the comments had tainted the regularity of the proceedings. *Id.*

[27] We find Fernbach's reliance of *Proctor* misplaced since the considerations in *Proctor* do not apply here. *Proctor* related to a situation where the trial court's comments had a prejudicial effect on jury deliberations. Fernbach's case pertains to a situation where counsel failed to object to the admission of evidence. Unlike the jury in *Proctor*, the jury in Fernbach's case was not directed to consider only the highlighted portions of Fernbach's medical records which the State sought to use during its case-in-chief.

[28] In rejecting Fernbach's claim of prejudice, the post-conviction court determined:

> After reviewing the transcript and the documents, it is apparent that portions of exhibits were highlighted in yellow by the State for witnesses to read into the record. It is completely reasonable for parties to argue a point in a document. The jury is then left to decide whether they accept or reject that argument. The entire document was submitted for the jury's review.
>
> * * *
>
> [Trial Counsel] sufficiently brought out through his questioning of Dr. Kurzhals that in all those highlighted documents the primary diagnosis was mental illness. [Fernbach] was not unfairly prejudiced by documents being admitted that were highlighted because that was simply the State pointing out certain references in the document to support their position, just as the defense did to point out their position.

(PCR App. Conf. Vol. II, p. 20).

[29] In the instant case, we also find a lack of prejudice because any advantage that the State derived from the use of the highlighted medical records during its case-in-chief was compensated for by Dr. Kurzhals' testimony which dispelled Fernbach's drug use as the reason for Fernbach's psychosis and delusions. Dr. Kurzhals testified that Fernbach's bipolar diagnosis could have been the reason why Fernbach experienced paranoid delusions. *See Harrison v. State*, 644 N.E.2d 1243, 1253 (Ind. 1995) (holding that "[p]sychiatry is an extremely uncertain field dealing with the mysteries of the human mind where expert opinions can be expected to and do differ widely"). Moreover, the trial court duly instructed the jury to consider all the evidence and not just the highlighted evidence that State used while questioning Susan. *See Duncanson v. State*, 509 N.E.2d 182, 186 (Ind. 1987) (holding that "When the jury is properly instructed, we will presume they followed such instructions"). If we must presume the jury followed the instructions, then we cannot assume, as Fernbach does, that the jury considered only the highlighted portions that the State stressed upon at his trial. Similarly, we find that the post-conviction court did not err in denying Fernbach's claim on this issue.

### 3. *State's Comments during Closing Argument*

[30] As a general proposition a jury may not be instructed on specific penal ramifications of its verdicts. *See Schweitzer v. State*, 552 N.E.2d 454, 457 (Ind. 1990). However, acknowledging the "potential for confusion in cases where the jury is faced with the option of finding a defendant not responsible by reason of

insanity or guilty but mentally ill," our supreme court has determined that when such options are before a jury "and the defendant requests a jury instruction on the penal consequences of these verdicts, the trial court is required to give an appropriate instruction or instructions as the case may be." *Georgopulos v. State*, 735 N.E.2d 1138, 1143 (Ind. 2000). An instruction on not guilty by reason of insanity was requested by Fernbach, and Final Instruction 28 advised the jury as follows:

> If the Defendant is found not responsible by reason of insanity at the time of the crime, the prosecuting attorney will file a petition for mental health commitment with the court. The court will hold a mental health commitment hearing at the earliest opportunity. The Defendant will be detained in custody until the completion of the hearing. If the court finds that the Defendant is mentally ill and either dangerous or gravely disabled, then the court may order the Defendant to be either placed in an outpatient treatment program of not more than ninety (90) days or committed to an appropriate mental health facility until a court determines commitment is no longer needed.

(Tr. App. Vol. II, p. 337). In his closing remarks, Trial Counsel read aloud Final Instruction 28, and then argued as follows:

> A not responsible by insanity defense doesn't mean he gets up out of his chair and walks out of here a free man. That's why that instruction is allowed to be given to assure that he doesn't just walk out and get out on the street. You have heard three (3) days of evidence that can be summed up in six (6) words, not responsible by reason of insanity.

(Trial Tr. Vol. V, p. 1205).  In the rebuttal portion of the State's closing argument, the State asserted:

> One statement I take serious issue with, [Trial Counsel] said I promise you he won't walk out of here.  Well, ladies and gentlemen, outpatient [is] outlined in final instruction twenty-eight (28) that you will get from the [c]ourt . . . An outpatient doesn't mean incarcerated and it doesn't mean somewhere enclosed.  Outpatient reminds me of Centerstone.

(Trial Tr. Vol. V, p. 1229).

[31]    Fernbach claims that the State's closing argument, which discussed the possibility of outpatient treatment such as that provided at Centerstone, created an erroneous view of the law and violated our supreme court's holding in *Caldwell v. State*, 722 N.E.2d 814, 816 (Ind. 2000).  In that case, the trial court had refused an instruction on the potential consequences of a not guilty by reason of insanity verdict, and the State had still informed the jury that a not guilty by reason of insanity verdict would mean that the defendant had a license to kill.  *Id*. at 816.  In this case, by contrast, the trial court agreed with Fernbach that the jury should be instructed on the potential consequences of a not guilty by reason of insanity verdict and gave such an instruction.  *See Georgopulos*, 735 N.E.2d at 1143.

[32]    While the State's closing argument did not refer to the consequences of a not guilty by reason of insanity verdict, Fernbach's closing argument did.  Despite the text of the upcoming Final Instruction 28, Trial Counsel argued, "A not responsible by insanity defense doesn't mean he gets up out of his chair and

walks out of here a free man." (Trial Tr. Vol. V, p. 1205). That argument was not entirely correct since the consequences of a not guilty by reason of insanity verdict as described in Final Instruction 28 did not include mandatory inpatient commitment. In light of that argument, the State's rebuttal argument was appropriate to correct the consequence of the not guilty verdict by reason of insanity as stated in Final Instruction 28.

[33] As aptly described by the post-conviction court, the State "argued one half of the statute while [Fernbach] argued the other. However, jurors were instructed to base their decision on the evidence presented to them, not the potential outcome of either verdict." (PCR App. Vol. II, p. 244). Had Trial Counsel objected, his argument would not have been sustained, thus, we conclude that Fernbach was not prejudiced.

## B. *Failure to Present Expert Testimony*

[34] Next, Fernbach argues that Trial Counsel was deficient in not obtaining an expert witness who "could have explained the rarity of outpatient treatment" after a not guilty by reason of insanity verdict and that the expert would have "given his opinion on whether Fernbach met the civil commitment standard and placement." (Appellant's Br. p. 50).

[35] Trial Counsel is given significant deference in choosing a strategy which, at the time and under the circumstances, he or she deems best. *Potter v. State*, 684 N.E.2d 1127, 1133 (Ind. 1997). "Although egregious errors may be grounds for reversal, we do not second-guess strategic decisions requiring reasonable

professional judgment even if the strategy or tactic, in hindsight, did not best serve the defendant's interests." *State v. Moore*, 678 N.E.2d 1258, 1261 (Ind. 1997). Such is the case here. We cannot say that the post-conviction court erred in concluding that Trial Counsel was not ineffective for failing to present an additional expert witness.

[36] At the post-conviction hearing, Trial Counsel testified that his trial defense strategy was to prove that Fernbach "was not guilty by reason of insanity." (PCR Tr. p. 9). Fernbach then called a forensic psychiatrist, Dr. George Parker (Dr. Parker) to testify that Trial Counsel should have procured an additional expert to testify that Fernbach met the criteria for civil commitment in the event the jury found him not guilty by reason of insanity. Fernbach maintains that such testimony would have been helpful to support Trial Counsel's closing argument that Fernbach would not *walk out* of the courtroom upon a finding of not guilty by reason of insanity. In its findings, the post-conviction court reviewed Trial Counsel's trial strategy and performance as follows:

> [Trial Counsel] prepared, submitted, and argued proposed final jury instructions that supported his insanity defense trial strategy. He ensured an instruction that distinctly and explicitly explained what would happen to [Fernbach] if found not responsible by reason of insanity was included and testified that he believed he argued that instruction during his closing argument. [*See*] Final Instruction No. 28. Based on the clear and explicit instruction, [Trial Counsel] testified that he did not consider calling an additional expert to explain what would happen to [Fernbach] if the jury found him not responsible by reason of insanity.

(PCR App. Vol. II, p. 240). Tactical choices by trial counsel do not establish ineffective assistance of counsel even though such choices may be subject to criticism or the choice ultimately prove[s] detrimental to the defendant." *Garrett v. State*, 602 N.E.2d 139, 142 (Ind. 1992). We agree with the post-conviction court that counsel was not ineffective in failing to call an additional expert witness to testify. Moreover, such evidence would have been cumulative evidence to the final instructions and would not lead to a reasonable probability that the jury would have reached a different verdict. *See Harrison v. State*, 707 N.E.2d 767, 784 (Ind. 1999). Accordingly, we conclude that Fernbach has failed to show the outcome of his trial would have been different had an additional expert witness testified. Thus, we conclude that Trial Counsel's failure to procure another expert does not overcome the strong presumption of counsel's competence.

## C. *Cumulative Error*

Finally, Fernbach contends that the cumulative effect of Trial Counsel's errors rendered the representation ineffective. "Errors by counsel that are not individually sufficient to prove ineffective representation may add up to ineffective assistance when viewed cumulatively." *French v. State*, 778 N.E.2d 816, 826 (Ind. 2002) (quotation omitted). Here, however, Fernbach has not established any errors by Trial Counsel; therefore, there can be no cumulative error. *See Lucas v. State*, 499 N.E.2d 1090, 1098 (Ind. 1986) (explaining that alleged errors that do not present a single basis for reversal "do not gain the stature of reversible error when viewed *en masse*").

# CONCLUSION

Based on the foregoing, we conclude that Fernbach was not denied the effective assistance of Trial Counsel.

Affirmed.

Vaidik, C. J. and Kirsch, J. concur