# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 20 2020, 10:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT *PRO SE*

Birt Ford
Pendleton, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Birt Ford,

*Appellant-Petitioner,*

*v.*

State of Indiana,

*Appellee-Respondent.*

March 20, 2020

Court of Appeals Case No.
19A-PC-2721

Appeal from the Allen Superior Court

The Hon. Frances C. Gull, Judge

Trial Court Cause No.
02D04-0708-PC-101

**Bradford, Chief Judge.**

# Case Summary

[1] In 2005, Birt Ford was convicted of Class A felony criminal deviate conduct, Class A felony rape, Class B felony burglary, Class B felony criminal confinement, and Class A misdemeanor invasion of privacy and received an aggregate sentence of seventy years of incarceration. We affirmed Ford's convictions and sentence on direct appeal. In 2007, Ford filed a petition for post-conviction relief ("PCR") and amended his petition in 2018. In 2019, the post-conviction court denied Ford's PCR petition in full.

[2] Ford appeals, contending that the post-conviction court erred in failing to conclude that he had received ineffective assistance of trial and appellate counsel. Specifically, Ford argues that his trial counsel was ineffective for failing to (1) adequately challenge the admissibility of his statement to police, (2) call witnesses to impeach the victim, (3) participate in plea negotiations, (4) engage an independent sexual expert, (5) engage a mental-health expert, (6) object to allegedly biased jurors, (7) object to alleged prosecutorial misconduct, (8) call Ford to testify on his own behalf, and (9) challenge the alleged exclusion of racial minorities from the jury. Ford contends that that his appellate counsel was ineffective for failing to (1) object to evidence of prior bad acts on relevancy grounds and (2) argue that the imposition of consecutive sentences was inappropriate. Because we conclude that none of these claims have merit, we affirm.

# Facts and Procedural History

[3]     We laid out the underlying facts of this case in our disposition of Ford's direct appeal:

> The facts most favorable to the verdict show that as of June 2005, Ford and Yolanda had been involved in a relationship for roughly twenty years and had been married for ten years. Ford and Yolanda have four children, the oldest being Laressa Ford, who was seventeen at the time of the trial. Ford and Yolanda's relationship was not always peaceful. In January 2005, a police officer was dispatched to the couple's residence to assist Yolanda with the removal of some of her items. At some point Ford told the officer, "I could do something to my wife while you are here in a nanosecond and there isn't anything you could do." Transcript at 238. On May 27, 2005, Yolanda obtained a protective order against Ford, prohibiting Ford from contacting Yolanda or from visiting Yolanda's residence. Despite this order, Ford continued to contact Yolanda. On May 30, Ford called Yolanda several times, attempting to convince her to attend a barbeque with him. Yolanda instead went to her cousin's residence. Ford arrived at the cousin's house and used force in an attempt to get Yolanda to leave with him, in the process giving Yolanda visible injuries to her arms and stomach. Yolanda's mother and a police officer, whom Yolanda's cousin had called, photographed the injuries. After this incident, Yolanda and her four children returned to a women's shelter where they had been residing.
>
> On June 11, 2005, Yolanda and her children returned to the residence that she rented from the housing authority, which had imposed a no-trespassing order on Ford. That same day, Ford called Yolanda and asked her to go to church with him. That night, Yolanda put three of her children to bed and fell asleep watching television with Laressa. Yolanda awoke when Ford kicked in the back door. Yolanda attempted to call 911, but Ford grabbed the phone from her, removed the battery, and threw the phone to the floor. Ford then placed a kitchen table in front of the back door and retrieved a butcher's knife from the kitchen.

Ford told Yolanda to go into the back room with him, which she did after some hesitation. Upon entering the back room, Ford locked the door and told Yolanda that if the police arrived he would kill her and "have the police kill him." Tr. at 163. Ford, while still holding the knife, told Yolanda to perform oral sex, which Yolanda did. Ford then took Yolanda into the bathroom, at which point they heard sirens and Ford repeated his threat to kill Yolanda if police entered the house. Ford called to Laressa, who told Ford that there was a fire across the street. After Ford entered the front room to check for himself, he told Laressa that if police entered the house, "both her parents [would] be dead." Tr. at 168. Ford then returned to the bedroom with Yolanda, put the knife on the nightstand and told Yolanda to remove her clothes. Ford then had sex with Yolanda, during which Yolanda told Ford that she felt violated. Ford and Yolanda then went to bed. Yolanda testified that she did not get out of bed because she was afraid that if she did, she would awake Ford. In the morning, Ford again had sex with Yolanda. While Ford was in the shower, Yolanda's mother came to the house, and Yolanda left with her and the four children. After they had driven away from the residence, Yolanda called the police and was then taken to a sexual assault treatment center. The nurse who examined Yolanda found injuries consistent with forced penetration.

*Ford v. State*, No. 02A03-0510-CR-510, Slip op. at 1 (Ind. Ct. App., Nov. 6, 2006) (footnote omitted), *trans. denied*.

[4] Later on June 12, 2005, Ford was interviewed by police. Ford was shackled to the floor for most of the interview, during which he admitted that he had gone to Yolanda's in violation of a protective order. Ford also admitted to having entered the residence without invitation but claimed that he had not kicked the door in. Ford admitted to having stepped on Yolanda's telephone but claimed that she had thrown it at him first. Ford admitted to having had a knife at one point but claimed that he had brought it for Yolanda and had told her to stab

him with it if she felt threatened by him. Finally, Ford admitted that he and Yolanda had had sexual intercourse twice but claimed that it had been consensual.

[5] On June 15, 2005, the State charged Ford with Class A felony criminal deviate conduct, two counts of Class A felony rape, Class B felony burglary, Class B felony criminal confinement, Class A misdemeanor interference with the reporting of a crime, and Class A misdemeanor invasion of privacy. On August 9, 2005, Ford moved to suppress his videotaped statement to police, which motion was denied. That same day, the State moved to admit evidence of Ford's actions in January and May of 2005, which motion was granted over Ford's objection.

[6] Jury trial occurred on August 9 and 10, 2005, after which the jury found Ford guilty of criminal deviate conduct, rape, burglary, criminal confinement, and invasion of privacy. On September 9, 2005, the trial court sentenced Ford to thirty years of incarceration each for criminal deviate conduct and rape, ten years each for burglary and criminal confinement, and one year for invasion of privacy. The trial court imposed an aggregate sentence of seventy years of incarceration.

[7] In Ford's direct appeal, he argued that the trial court had abused its discretion in admitting evidence concerning two prior incidents between Ford and his victim. *Id*. at 5–9. Ford also argued that his sentence was inappropriate. *Id*. at 9–11. We affirmed Ford's convictions and sentence in an unpublished decision on November 6, 2006. *Id*. at 11. Ford petitioned for PCR on August 28, 2007,

and filed an amended PCR petition on December 14, 2018. On October 18, 2019, the post-conviction court denied Ford's PCR petition in full.

# Discussion and Decision

### *Standard of Review*

Ford contends the post-conviction court erred in denying his PCR petition. Our standard for reviewing the denial of a PCR petition is well-settled:

> In reviewing the judgment of a post-conviction court, appellate courts consider only the evidence and reasonable inferences supporting its judgment. The post-conviction court is the sole judge of the evidence and the credibility of the witnesses. To prevail on appeal from denial of post-conviction relief, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite to that reached by the post-conviction court. […] Only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion, will its findings or conclusions be disturbed as being contrary to law.

*Hall v. State*, 849 N.E.2d 466, 468, 469 (Ind. 2006) (internal citations and quotations omitted).

# I. Ineffective Assistance of Trial Counsel

Ford contends that the post-conviction court erred in concluding that he had not received ineffective assistance of trial counsel. We review claims of ineffective assistance of counsel based upon the principles enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984):

> Under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), a claim of ineffective assistance of counsel

> requires a showing that: (1) counsel's performance was deficient by falling below an objective standard of reasonableness based on prevailing professional norms; and (2) counsel's performance prejudiced the defendant so much that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 687, 694, 104 S. Ct. 2052; *Lowery v. State*, 640 N.E.2d 1031, 1041 (Ind. 1994). […] Failure to satisfy either prong will cause the claim to fail. *Vermillion v. State*, 719 N.E.2d 1201, 1208 (Ind. 1999).

*French v. State*, 778 N.E.2d 816, 824 (Ind. 2002).

[10] Moreover, counsel is given wide discretion in determining strategy and tactics, and therefore courts will accord these decisions deference. *Timberlake v. State*, 753 N.E.2d 591, 603 (Ind. 2001). "A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. "Whether a lawyer performed reasonably under the circumstances is determined by examining the whole of the lawyer's work on a case." *Oliver v. State*, 843 N.E.2d 581, 591 (Ind. Ct. App. 2006), *trans. denied*. It is worth noting that neither Ford's trial nor appellate counsel testified, submitted affidavits, or were deposed in this proceeding. "When counsel is not called as a witness to testify in support of a petitioner's arguments, the post-conviction court may infer that counsel would not have corroborated the petitioner's allegations." *Oberst v. State*, 935 N.E.2d 1250, 1254 (Ind. Ct. App. 2010), *trans. denied*.

[11] Ford makes several claims of ineffective assistance of trial counsel. As an initial matter, Ford claims that his trial counsel was unprepared for his trial and frames this as a separate claim. It would be fair to say, however, that, rather

than make a distinct claim of unpreparedness, Ford cites it as a contributing factor to the alleged ineffective assistance in several of his more specific claims. Consequently, we do not address general unpreparedness as a distinct claim.

## A.  Failure to Adequately Challenge Statement to Police

Ford contends that his trial counsel was ineffective for failing to adequately challenge the admission of his videotaped statement to police on Fourth and Fifth Amendment grounds.  Ford has not established, however, that his trial counsel could have altered his approach in any way that would have resulted in suppression of the statement.  As for the Fourth Amendment, it provides all citizens with the "right … to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures[.]"  U.S. CONST. amend. IV. There does not seem to be any dispute that Ford had been "seized" when he gave his statement to police, as he was shackled to the floor for most of the interview.  "The Fourth Amendment's requirement that searches and seizures be founded upon an objective justification, governs all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Mendenhall*, 446 U.S. 544, 551 (1980) (citations and quotation marks omitted).  Accordingly, Ford's seizure was constitutional only if authorities reasonably suspected him of wrongdoing.  *Id.* at 551–52.  Ford does not claim that the authorities lacked reasonable suspicion of wrongdoing, seemingly arguing only that his shackling was inherently illegal.  Ford provides us with no authority to support the propositions either that shackling during a police interview is *per se* illegal or that it was unreasonable in this case.  Of

course, it is not at all uncommon for criminal suspects to be handcuffed or shackled, and Ford was suspected of committing some very serious crimes indeed. Whether the purpose of the shackling during the interview was to reduce the risk of attack or prevent flight, we cannot say that it was unreasonable in this case, much less illegal.

[13] Ford also contends that his statement was taken in violation of the Fifth Amendment, which provides, in part, that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Specifically, Ford seems to argue that police misconduct rendered his statements involuntary.

> When a defendant challenges the admissibility of his confession, the State must prove beyond a reasonable doubt that the confession was given voluntarily. *Carter v. State*, 730 N.E.2d 155, 157 (Ind. 2000); *Schmitt v. State*, 730 N.E.2d 147, 148 (Ind. 2000). The voluntariness of a confession is determined from the "totality of the circumstances." *Berry v. State*, 703 N.E.2d 154, 157 (Ind. 1998). The "totality of the circumstances" test focuses on the entire interrogation, not on any single act by police or condition of the suspect. *Light v. State*, 547 N.E.2d 1073, 1079 (Ind. 1989). We review the record for evidence of inducement by way of violence, threats, promises, or other improper influences. *Berry*, 703 N.E.2d at 157.

*Henry v. State*, 738 N.E.2d 663, 664 (Ind. 2000) (footnote omitted). Ford's entire argument seems to be that he was compelled to incriminate himself during his police interview because he was shackled to the floor during it. As mentioned, Ford has not established that his restraint was improper, and we therefore look to the totality of the circumstances surrounding his statement.

[14]     A redacted version of the interview was shown to the jury as State's Exhibit 36, while an unredacted version was admitted as State's Exhibit 1 at the suppression hearing and partially viewed by the trial court. During argument, the prosecutor summarized the events shown in State's Exhibit 1, a summary Ford does not challenge and which, based on our review of the exhibit, is accurate:

> Mr. Ford indicated to [Detective] Garry Hamilton that he has a high school diploma as well as two years of college. Detective Hamilton began to then advise the Defendant[] of his rights to make sure that he was fully aware of what his rights were. The Defendant did make the statement I'm going to plead the Fifth right now. Garry said you don't have to say anything, but then the Defendant kept asking Garry Hamilton. He continued to question Garry. He continued to talk to Garry. He told Garry I will talk to you if I know what this case is about. He continues to ask questions. He continues to talk to Garry. Garry tells him, stop, I cannot talk to you unless I advise you of your rights and you agree to waive those rights. He says again for the third time, I do want to talk. He keeps talking. He keeps talking and talking and talking and talking. Then he says I want to talk to you about this and Garry says okay, well, if you want to talk, we have to go over your rights. And so then he begins to go over the rights and before he even signs the first one, I think he says wait a minute, I want to pray about this. So then he prays and then he starts to acknowledge and that understands his rights. When Detective Hamilton gets to the point that he has a right to a lawyer and he explains that, the Defendant says, well, do you have a lawyer here? And he says, no, if you want a lawyer you can call one up and we'll stop. You have a right. He again says I want to talk to you. I want to answer questions. Then at some point he--he again says, I don't understand this. I don't understand the waiver. I don't like the term waiver of rights and Garry says, okay, fine. We'll terminate this interview. He gets up to leave.

The Defendant does not let Garry Hamilton leave. He continues to talk to Garry. He still wants Garry to sit down with him. He's talking again. He's asking Garry, what do you think I should do? Do you think I should talk or do you think I shouldn't talk? Garry says I can't advise you. That's your decision. You have to make this decision. He says I don't understand about the terminating the interview and Garry explains that to him. He continues to ask Garry questions and Garry is just responding. He wants to know what the investigation is about. Again, he--he makes another comment. Garry says okay, that's all we can do. I'm not going to talk to you. The Defendant reinitiates the contact. He continues to talk to Garry. Garry tries to leave the room again. The Defendant won't let him leave the room. He continues talking to Gary. Then Garry tries to leave the room a fourth time. He says no. He says come back here. 'Cause Garry says, I'm going to go. I'm leaving. I'm going to come back and I'll tell you what you're being charged with and he says no, no. I--I want to talk to you. When you come back, can I talk to you? Garry says no. He says I--I don't know what to do. Garry says, listen, I'll give you some time to think about it. I'll leave. Garry leaves the room for 15 minutes, Your Honor. The interview, he leaves at 23 minutes. He comes back at 38 minutes. And when he comes back he has Detective Russell. You saw that portion. We did fast forward to that, but we kept the tape playing, running so that you could see. Not one person came into that interview room. Not one person coerced Mr. Ford. Nobody came in to try to coerce him into doing anything. Garry comes back in the room and the Defendant says I want to sign the paper. I am more than willing to talk to you. I want [you] to know what took place. I want to sign that paper. I want the truth to be known. I want to give a statement.

Trial Tr. pp. 7–10. Before the interview substantively began, Ford also signed, and indicated that he understood, an advisement of rights. Far from being coerced, the totality of the circumstances indicates that Ford practically insisted on telling the detectives his side of the story. Put simply, nothing in the record

gives the slightest indication that Ford's statement was the result of coercion or any other police misconduct. Ford's trial counsel was not ineffective for failing to more vigorously challenge the admission of his statement to police.

## B. Impeachment Witnesses

Ford claims that his trial counsel should have called Barbara and Jimmy Ford to the stand, witnesses he claims would have testified that Yolanda had a propensity to lie. Indiana Evidence Rules 608 and 609 provide that a witness's credibility can be impeached by opinion or reputation evidence as to the witness's character for truthfulness but *not* by specific instances of untruthfulness unless they have resulted in convictions for dishonesty-related offenses. *Phillips v. State*, 550 N.E.2d 1290, 1297 (Ind. 1990). As for Barbara, Ford argues that she would have testified about two specific lies that Yolanda told. Ford does not claim, however, that either of these alleged lies resulted in a conviction for a dishonesty-related crime. As for Jimmy, while Ford argues now that Jimmy would have testified regarding Yolanda's history of dishonesty, his trial counsel only argued that he would have corroborated one of the incidents about which Barbara intended to testify. In other words, because Ford has failed to establish that either Barbara or Jimmy would have provided any admissible impeachment evidence, he cannot establish that his trial counsel was ineffective for not calling them to testify.

## C. Plea Negotiations

Ford contends that his trial counsel was ineffective for failing to explore a plea deal with the State. Ford concedes that his trial counsel did inform him of a

letter from the State regarding a potential guilty plea. Ford contends, however, that he instructed his trial counsel to pursue the matter but that he did not. The only support for Ford's claim that "defense counsel did nothing concerning [Ford's] request" to discuss a plea agreement with the State, Appellant's Br. p. 15, is provided by his own self-serving affidavit, which the post-conviction court was under no obligation to credit. Moreover, because Ford's trial counsel did not provide any evidence in this proceeding, we may presume that he would not have corroborated Ford's account. *See Oberst*, 935 N.E.2d at 1254.

## D. Independent Sexual Expert

[17] Ford contends that his trial counsel was ineffective for failing to employ an expert who would have rebutted testimony from Nurse Darlene Richards that Yolanda had sustained "shearing" injuries on her cervix consistent with blunt-force trauma. Trial Tr. pp. 260–65. Ford, however, does not explain what such an expert would have said or how the testimony could have helped him at trial. Ford's argument that any expert would have generally assisted his trial counsel in addressing Nurse Richards's testimony is far too vague to establish ineffective assistance of trial counsel.

## E. Mental-Health Expert

[18] Ford contends that his trial counsel was ineffective for failing to call a witness who would testify that Yolanda was taking medication to treat bi-polar disorder around the time of Ford's crimes, which would have contradicted Yolanda's testimony that she was not taking her medication. Even if such a witness had so testified, we fail to see how such an impeachment would have helped Ford.

We think it is a stretch, to say the least, to maintain that a jury would be likely to conclude that Yolanda was lying about Ford's crimes against her based on the fact she lied about not taking her medication, even if true. Corroborating evidence of Ford's crimes makes this even less likely. The jury saw and heard ample evidence beyond Yolanda's testimony that Ford committed the crimes for which he was convicted, including Nurse Richards's testimony, photographic evidence of the crime scene, Laressa's testimony, and—last but not least—Ford's own incriminating statements. Ford has failed to establish how he was prejudiced in this regard.

[19] Ford also contends that an expert should have been found who could have testified regarding the effect on a person's behavior when they do not take medication for bi-polar disorder. For one thing, this claim is inconsistent with Ford's apparent claim that he had evidence that Yolanda was, in fact, taking her medications. In any event, Ford does not explain what such an expert would have said that would have had any bearing on his trial whatsoever, only that he wanted such an expert to "testify about being bi-polar and the cause and effect of and not taking the medication to treat this disorder[.]" Appellant's Br. p. 21. Ford has failed to establish ineffective assistance of trial counsel in this regard.

## F. Objections to Jurors

[20] Ford claims that his trial counsel was ineffective for failing to challenge several jurors on the basis that they had been victims of or knew victims of sexual or violent crime: Juror 14 (robbery in 1999); Juror 12 (robbery); Juror 53 (knew

victim of sexual or physical assault); and Juror 62 (was in violent domestic relationship). All four jurors, however, indicated that their past experiences would not affect their abilities to serve as jurors. Juror 14, who, in addition to being a crime victim, also personally knew someone charged with a crime, indicated that he did not believe that either of those experiences would impact his ability to be fair and impartial. Juror 12's responses to questioning make it clear, in context, that his experience would not affect his ability to be fair and impartial and that he would not hold his experience as a crime victim against Ford. Juror 53 stated that she did not think there was anything about her prior experience that would make her unfair or partial and that she could set aside her past experience and base her decision on what she heard at trial. Juror 62 stated the he or she could be fair and base his or her decision on what occurred in the courtroom as opposed to any outside factors. In summary, all four of the jurors indicated that they could be impartial despite their experiences.

[21] Despite these declarations of impartiality, Ford maintains that all four jurors were clearly biased and partial and that his trial counsel was ineffective for allowing them to be seated. Whether Ford thinks his trial counsel should have used peremptory strikes on the four jurors or challenged them for cause, his argument fails either way. In the first case, the question is essentially whether Ford's trial counsel was ineffective for believing the four jurors when they said they could be impartial. Ford points to nothing in the record that would cast any doubt on the jurors' veracity or call his trial counsel's judgment into doubt.

As such, Ford has failed to establish that his trial counsel's performance was deficient for failing to peremptorily strike the four jurors.

[22] As for whether Ford's trial counsel should have challenged the jurors for cause, the question is essentially whether there is any reason to think that those challenges would have succeeded. There is a presumption that a juror is truthful when the juror claims to be able to set aside preconceived notions and render a verdict based on the evidence. *See Ward v. State*, 810 N.E.2d 1042, 1050 (Ind. 2004). As mentioned, all four jurors indicated that their experiences would not prevent them from being fair and impartial, and the record provides no reason to doubt them or to suspect that the trial court would have granted a for-cause challenge to any of them. Ford has failed to establish that his trial counsel's performance was deficient for failing to challenge the four jurors for cause.

## G. Prosecutorial Misconduct

[23] Ford contends that his trial counsel was ineffective for failing to object to alleged prosecutorial misconduct. Specifically, Ford contends that the prosecutor committed misconduct when he asked the venire during *voir dire*, "when something happens, you like to hear both sides of the story. Who likes to hear both sides of the story?" Trial Tr. p. 60. Although Ford characterizes this as an impermissible comment on his right and/or decision not to testify, he has taken it completely out of context. Immediately after the above question, the prosecutor stated the following:

I know I do.  I'm sure everyone out there does too.  Do you understand in a criminal case sometimes you don't hear both sides?  You just hear from the Victim, Yolanda, okay?

(No response.)

And even though you might want to hear from him, he has the right not to, for whatever reason.  Do you understand that?

(No response.)

Can you not hold that against him?

(No response.)

If he chooses not to testify?  'Cause the law is going to say you can't hold that against him.  So do you think you can base the decision on the evidence and not hold anything against Mr. Ford if he chooses not to talk.  Is that okay?

JUROR 57: Uh-huh (affirmative).

I'm going to ask everyone.  Is everyone fair with that?  Does everyone think that's a fair system that we have here?

(No response.)

Is anybody going to hold it against Mr. Ford if he chooses that he doesn't want to testify?

(No response.)

Okay.

Trial Tr. pp. 61–62.  Far from committing misconduct, the prosecutor was *clarifying* that a defendant's refusal to testify could not be held against him. Ford's argument is based on a false premise, and his trial counsel was not ineffective for failing to object to the prosecutor's statements.

## H.  Not Calling Ford to Testify

[24]   Ford claims that his trial counsel was ineffective for telling the jury during his opening that he would testify and then not putting him on the stand.  It is true

that Ford's trial counsel did give some indication that he expected Ford to testify, *e.g.*, "Birt will tell you, he'll testify to this[,]" Tr. p. 135, and "Birt's going to testify that at this period of time--well, let me back up. He will testify that he's been with this woman 20 years and that he knows her personality for lack of a better word." Tr. p. 136. After giving the jury the impression that Ford would testify, the argument seems to go, his trial counsel was ineffective because he did not actually call him to stand, thereby prejudicing him when the jury did not get to hear his side of the story.

[25] First, this argument is partially premised on the false claim, made in the last section, that the prosecutor improperly told the jury that it could hold Ford's failure to testify against him. Second, Ford does not explain how his trial counsel could have prevented him from taking the stand if he had insisted on testifying. Finally, there is no reason to believe that testifying would have helped Ford. Ford's "side of the story" was already going to be before the jury, in the form of his videotaped statement. If Ford had testified in way consistent with his statement, his testimony would have been merely cumulative. If he had contradicted his statement, he would have impeached himself. Moreover, in either circumstance he would have been subject to cross-examination, which we cannot imagine would have helped him. Under the circumstances, we conclude that Ford has failed to establish that his trial counsel was ineffective in this regard.

# I. *Batson*

Ford contends that his trial counsel was ineffective for failing to challenge the alleged removal of the only African-American from the venire without justification.

> "Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Batson v. Kentucky*, 476 U.S. 79, 86, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). The exclusion of even a sole prospective juror based on race, ethnicity, or gender violates the Fourteenth Amendment's Equal Protection Clause. *See Snyder v. Louisiana*, 552 U.S. 472, 478, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008).

*Addison v. State*, 962 N.E.2d 1202, 1208 (Ind. 2012).

The threshold for a *Batson* challenge is a showing of circumstances giving rise to an inference that discrimination occurred. *See id*. Other than Ford's self-serving affidavit, however, the record is devoid of any evidence that the venire contained any African-Americans at all, much less that the sole African-American was surreptitiously removed from the venire when Ford was on a short bathroom break. Again, in the absence of any evidence from Ford's trial counsel (or anyone else, for that matter) we may presume that he would not have corroborated Ford's somewhat implausible claim. Ford has failed to establish that his trial counsel was ineffective for failing to make a *Batson* challenge.

# J. Cumulative Error

Finally, Ford seems to argue that even if none of the alleged instances of ineffective assistance of trial counsel are serious enough to warrant relief on

their own, their cumulative effect does. Ford, however, has failed to establish that any of his claims have merit. Because nothing plus nothing still equals nothing, Ford's claim of cumulative error fails.

## II. Ineffective Assistance of Appellate Counsel

[29] We review claims of ineffective assistance of appellate counsel using the same standard applicable to claims of trial counsel ineffectiveness. *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000). The petitioner must show that appellate counsel was deficient in his performance and that the deficiency resulted in prejudice. *Id*. Ineffective assistance claims at the appellate level of proceedings generally fall into three basic categories: (1) denial of access to an appeal; (2) waiver of issues; and (3) failure to present issues well. *Bieghler v. State*, 690 N.E.2d 188, 193–95 (Ind. 1997).

[30] To prevail on a waiver-of-issues claim of ineffectiveness, "'the defendant must overcome the strongest presumption of adequate assistance and judicial scrutiny is highly deferential.'" *Garrett v. State*, 992 N.E.2d 710, 724 (Ind. 2013) (quoting *Ben-Yisrayl*, 738 N.E.2d 253, 260–61 (Ind. 2000)). This is because the decision of which issues to raise "is one of the most important strategic decisions to be made by appellate counsel." *Bieghler*, 690 N.E. 2d at 193. "Accordingly, when assessing these types of ineffectiveness claims, reviewing courts should be particularly deferential to decision to exclude certain issues in favor of others, unless such a decision was unquestionably unreasonable." *Id*. at 194.

[31] We must determine "whether the unraised issues are significant and obvious from the face of the record and […] whether the unraised issues are 'clearly

stronger' than the raised issues." *Garrett*, 992 N.E.2d at 724 (citing *Timberlake*, 753 N.E.2d at 605–06). If deficiency is proved, then the prejudice analysis "requires an examination of whether 'the issues which […] appellate counsel failed to raise would have been clearly more likely to result in reversal or an order for a new trial.'" *Id*. (quoting *Bieghler*, 690 N.E.2d at 194). Again, we afford significant deference to the decisions of appellate counsel regarding which claims to raise, as "the process of 'winnowing out weaker claims on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Burger v. Kemp*, 483 U.S. 776, 784 (1987) (quoting *Smith v. Murray*, 477 U.S. 527, 536 (1986)) (quotation marks omitted).

## A. Evidence Rule 403 Claim

Ford claims that his appellate counsel was ineffective for failing to argue that the trial court abused its discretion in admitting evidence regarding incidents in January and May of 2005. Ford argues that the evidence should have been excluded pursuant to Evidence Rule 403, which provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." While it is true that we did not reach the question of whether the evidence of prior incidents was admissible pursuant to Evidence Rule 403, we did determine that any error that was committed in the admission of the evidence was harmless. *Ford*, No. 02A03-0510-CR-510 at 4. Ford's appellate

counsel was not ineffective for failing to raise a claim that we determined could amount to nothing more than harmless error.

## B. Challenge to Consecutive Sentences

[33] Although Ford's appellate counsel did challenge the appropriateness of Ford's seventy-year sentence in his direct appeal, Ford contends that he was ineffective for failing to specifically challenge the appropriateness of the imposition of consecutive sentences. Ford, however, *did* make this very challenge on direct appeal, and we rejected it. *See* Appellant's Direct Appeal Br. p. 24 ("[W]hile the aggravating circumstances in Mr. Ford's case may warrant some type of an enhanced sentence, to make the Criminal Deviate Conduct, the Rape and the Criminal Confinement sentences consecutive to one another for an aggregate of seventy (70) years is, in Mr. Ford's opinion, manifestly unreasonable."). Ford's appellate counsel could not have been ineffective for not making an argument that he did, in fact, make.

[34] We affirm the judgment of the post-conviction court.

Robb, J., and Altice, J., concur.